In re REGENCY HOLDINGS
(CAYMAN), INC., et al.,
Debtors.

REGENCY HOLDINGS (CAYMAN),
INC., and Regency Maritime
Corp., Plaintiffs,

v.

The MICROCAP FUND, INC. (f/k/a Commonwealth Associates Growth Fund, Inc.) Edmund H. Shea, Jr., as Nominee, Robinson Trust, Randyl L. Stuckemeyer, Susan K. Stuckemeyer, Lawrence Field, Daniel S. Hermann, John H. Robinson, E & M RP Trust, E & M Shea Family Foundation (a/k/a Edmund & Mary Shea Foundation, E & M Foundation and/or E & M Shea Foundation), Siam Partners II and Tahoe Partners, Defendants.

Bankruptcy Nos. 95–B–45197 (TLB)
through 95–B–45203 (SMB).
Adversary No. 96/8230A (SMB).

United States Bankruptcy Court,
S.D. New York.

Jan. 5, 1998.

Windels Marx Davies & Ives, Charles E. Simpson, James M. Shaughnessy, Gary F. Eisenberg, of Counsel, New York City, for Plaintiffs.

Mayer Brown & Platt, Michael P. Richman, of Counsel, New York City, for Defendants Microcap Fund, Inc. (f/k/a Commonwealth Associates Growth Fund, Inc.), Edmund H. Shea, Jr., as nominee, E & M RP Trust, E & M Shea Family Foundation (a/k/a Edmund & Mary Shea Foundation, Edmund & Mary Shea Family Foundation, E & M Foundation and/or E & M Shea Foundation), Siam Partners II and Tahoe Partners.

Paradise & Alberts, L.L.P., Allen Taffet, of Counsel, New York City, for Defendants Robinson Trust and John H. Robinson.

Sawyer & Galancy, P.L.L.C., Nicholas Galancy, of Counsel, Lexington, KY, for Defendants Randyl L. Stuckemeyer, Susan K. Stuckemeyer and Daniel S. Hermann.

## MEMORANDUM DECISION GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS

STUART M. BERNSTEIN, Bankruptcy Judge.

The plaintiffs commenced this adversary proceeding to recover certain transfers as preferential and fraudulent. The pending matter, however, concerns the preference claim asserted by the plaintiff Regency Holdings (Cayman), Inc. ("Holdings"). Because the claim raised a threshold issue, Holdings, in accordance with the Court's direction, presented its direct case through a written proffer (the *"Proffer"*). The defendants other than Lawrence Field[1] thereafter moved, pursuant to Fed.R.Civ.P. 52(c) and Bankruptcy Rule 7052, for the entry of judgment dismissing the preference claim. For the reasons that follow, the motion is granted.

---

**1.** By Order dated November 25, 1996, I granted summary judgment to the defendant Lawrence Field dismissing the preference claim asserted by Regency Holdings (Cayman), Inc. The remaining defendants made this motion.

## BACKGROUND

### A. The Debtors and their Related Entities

The debtors in these chapter 11 cases, with other non-debtor, related entities, operated a cruise line business through an elaborate chain of parent-subsidiary relationships. At the helm stood Captain Antonios E. Lelakis ("Captain Lelakis" or "Lelakis"). Around 1990, Captain Lelakis formed Rainbow Cruises, Inc. ("Rainbow"), a Cayman Islands corporation, and became its sole shareholder. (*Proffer,* ¶ 21.) In 1993, Captain Lelakis contributed his Rainbow stock to the Kriti Benefit Trust (the "Kriti Trust"), a trust organized and existing under the laws of Bermuda. (*Id.,* ¶ 25.) While a "protector" was appointed with the power to appoint and remove trustees of the Kriti Trust, Captain Lelakis retained, *inter alia,* the power to appoint and remove the protector. (*Id.,* ¶ 26.)

After its formation, Rainbow began acquiring the stock of Regency Cruises, Inc. ("Cruises"), a publicly traded Delaware corporation. (*Id.,* ¶¶ 2, 20, 22.) By May 1993, it had acquired 33.06% of the outstanding stock. (*Id.* ¶ 22). On May 25, 1993, Lelakis caused Rainbow to transfer its Cruises shares to Rainbow's wholly-owned subsidiary, Holdings, which Lelakis had formed in July 1992. (*Id.,* ¶¶ 21, 23.) Concurrently, Holdings acquired the remaining 66.94% stock of Cruises. (*Id.,* ¶ 24.)

Lelakis controlled the cruise line business through this corporate hierarchy. Cruises handled sales and marketing under agreements with its wholly-owned subsidiary, Regency Maritime Corp. ("Maritime"), (*id.,* ¶¶ 3, 14), which, in turn, operated the cruise line. (*Id.,* ¶ 13.) Holdings acted as a holding company, (*id.,* ¶ 81), owning 100% of the shares of Cruises as well as all of the shares of the debtors Ridan Investment Trust Inc. ("Ridan"), (*id.,* ¶ 5), World Pioneer S.A. ("World Pioneer"), (*id.,* ¶ 6), and Jo–Dim Investment Trust S.A. ("Jo–Dim"). (*Id.,* ¶ 7.) Holdings, Cruises and Maritime always maintained separate books and records. (*Id.,* ¶ 80.)

These acquisitions and other transactions created a multi-generational chain of parent-subsidiary relationships with Lelakis as the progenitor. He controlled the Kriti Trust; the Kriti Trust owned and controlled Rainbow; Rainbow owned and controlled Holdings; Holdings owned and controlled Cruises; and Cruises owned and controlled Maritime. (*Id.,* ¶ 82.) At all relevant times, Captain Lelakis served as Chairman of the Board of Holdings, and his long-time colleague Peter G. Stamoulis ("Stamoulis") served as its President, Chief Executive Officer and a member of its board. (*Id.,* ¶¶ 85–86.) Neither held any official position as officer or director of Cruises or Maritime until July 18, 1995, the day after the last allegedly preferential transfer. On that day, they were elected to the boards of both Cruises and Maritime, along with two other long-time employees of Captain Lelakis. (*Id.,* ¶ 84.)

### B. The Loan

In July 1994, Lelakis and Stamoulis decided to borrow approximately $3.75 million. (*See Proffer,* ¶¶ 36, 87.) Using Holdings as the borrower, they obtained the funds from the defendants who received notes issued by Holdings and warrants redeemable for the purchase of Holdings's stock. (*Id.,* ¶ 36.) Although the titular borrower, Holdings never saw the funds. They were not deposited in Holdings's bank account because Holdings did not have a bank account. (*Id.,* ¶ 79.) Instead, Lelakis and Stamoulis deposited the funds in Cruises's account at the Bank of New York ("BONY"), and subsequently transferred the funds to Maritime's account at BONY. (*Id.,* ¶¶ 88–89.) Lelakis and Stamoulis then caused Maritime to pay the funds to Avlis Shipyard S.A. ("Avlis") in connection with the reconstruction of a cruise ship, the M.V. Regent Jewel. (*Id.,* ¶ 90.) Seasonal Navigation S.A. ("Seasonal") owned the ship, (*id.*), and Lelakis owned and controlled both Avlis and Seasonal. (*Id.,* ¶¶ 91–92.) On November 18, 1994, Lelakis and Stamoulis caused Seasonal to sell the Regent Jewel to Jewel Cruise, Inc. ("Jewel"), a wholly-owned subsidiary of Holdings. (*Id.,* ¶ 93.)

## C. The Transfers

The notes issued to the defendants matured on January 22, 1995, but Holdings exercised its right to extend the loans for two successive periods of approximately three months each. (*Proffer,* ¶¶ 45–56.) In connection with each extension, Holdings issued replacement notes, (*id.,* ¶¶ 47, 51), and made certain payments (the "Default Payments") to the defendants. Lelakis and Stamoulis decided that Cruises and Maritime would make these as well as the final payments on behalf of Holdings.[2] (*Id.,* ¶¶ 96–97, 99, 101.) Maritime made the first Default Payments on January 25, 1995, (*id.,* ¶ 47), Cruises made the second Default Payments on April 26, 1995, (*id.,* ¶ 51), and Maritime made the final payments, satisfying the notes and redeeming the warrants, on July 17, 1995. (*Id.,* ¶ 53.)

## D. The Bankruptcies

On November 7, 1995, Holdings, Cruises and Maritime filed chapter 11 petitions. In addition, Maritime's wholly-owned subsidiary, Regsun Holding, Ltd. ("Regsun") and Holdings's wholly-owned subsidiaries, Ridan, World Pioneer S.A. and Jo–Dim, also filed on that date. (*Proffer,* ¶¶ 4–8.) On June 3, 1997, the Court confirmed liquidation plans that substantively consolidated Regsun with Maritime, (*id.,* ¶ 11), and Ridan, World Pioneer and Jo–Dim with Holdings. (*Id.,* ¶ 12.) To date, Cruises has not confirmed any plan. (*See id.,* ¶¶ 8–12.) Thus, although Holdings and Maritime have been substantively consolidated with other Regency debtors, they have not been substantively consolidated with each other or with Cruises.

## DISCUSSION

### A. The Standard Applicable To A Rule 52(c) Motion

■ Invoking Fed.R.Civ.P. 52(c)[3], the defendants other than Field have moved for judgment on partial findings. The motion should be granted where the plaintiff fails to make out a *prima facie* case, or despite a *prima facie* case, the court determines that the preponderance of evidence goes against the plaintiff's claim. *Stokes v. Perry,* No. 94 Civ. 0573, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19, 1997). The court does not evaluate the evidence under the standards governing a directed verdict. 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2573.1, at 496–97 (1995) ("*Wright & Miller*"). It does not draw any special inferences in the nonmovant's favor, *Wright & Miller* § 2573.1, at 497–98, or consider the evidence in the light most favorable to the nonmoving party. *Geddes v. Northwest Missouri State Univ.,* 49 F.3d 426, 429 n. 7 (8th Cir.1995); *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F.Supp. 1454, 1460 (D.Kan.1996). Instead, the court acts as both judge and jury, *Grant v. Bullock County Bd. of Educ.,* 895 F.Supp. 1506, 1509 (M.D.Ala.1995), weighing the evidence, resolving any conflicts, and deciding where the preponderance lies. *International Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.,* 13 F.3d 253, 257 (7th Cir.1994); *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F.Supp. at 1460; *Grant v. Bullock County Bd. of Educ.,* 895 F.Supp. at 1509; *Wright & Miller* § 2573.1, at 498–99.

■ If the court grants the motion, it must support its judgment with findings of fact and conclusions of law. Fed.R.Civ.P. 52(c). Its factual findings are subject to appellate review under the "clearly erroneous" standard. *Geddes v. Northwest Missouri State Univ.,* 49 F.3d at 429 n. 7; *Price v. United States Navy,* 39 F.3d 1011, 1021 (9th Cir.1994); *Wright & Miller* § 2573.1, at

---

**2.** Cruises and Maritime were not liable for the repayment of the loans. Further, they never agreed to lend Holdings the necessary funds. (*Id.,* ¶ 95.)

**3.** Rule 52(c) provides:

If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

502. A judgment under Rule 52(c) operates as a decision on the merits in favor of the moving party. *Id.,* § 2573.1, at 496.

## B. The Debtor's Preference Theory

■ While a preference claim contains several elements, the motion focuses on Holdings's proof that it transferred an "interest of the debtor in property." *See* 11 U.S.C. § 547(b). State law normally determines the extent of an interest in property, absent an overriding federal policy. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Morton v. Nat'l Bank of New York City (In re Morton),* 866 F.2d 561, 563 (2d Cir.1989). Bankruptcy law determines whether that interest is "property of the estate." *In re Prudential Lines, Inc.,* 928 F.2d 565, 569 (2d Cir.), *cert. denied,* 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1101 (2d Cir.1990); *In re Haedo,* 211 B.R. 149, 151 (Bankr.S.D.N.Y. 1997).

■ A preference action is designed to recover property that would have been available for distribution to the creditor body but for the transfer. *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). Conversely, property that would not have been property of the estate cannot be recovered. Thus, the definition of "property of the estate" contained in 11 U.S.C. § 541 determines the scope of interests in property recoverable under section 547. *Id.* at 58–59, 110 S.Ct. at 2262–63. The thrust of the defendants' motion is that Holdings did not make out a *prima facie* case that it held an interest in the funds paid by its subsidiary—and its subsidiary's subsidiary—to the defendants.

■ As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. *See, e.g., Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 643 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); 1 Charles R.P. Keating,

*et al., Fletcher Cyclopedia of the Law of Private Corporations,* § 25, at 30 (1997 Supp.). The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's. *In re Beck Indus., Inc.,* 479 F.2d 410, 415–16 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *accord In re Adolf Gobel, Inc.,* 80 F.2d 849, 851 (2d Cir.1936); *In re Brierley,* 145 B.R. 151, 169 (Bankr. S.D.N.Y.1992). Hence, the parent's creditors have no claim to the subsidiary's assets, and *vice versa.* A party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated. *See, e.g., Helena Chem. Co. v. Circle Land & Cattle Corp. (In re Circle Land & Cattle Corp.),* 213 B.R. 870, 874–76 (Bankr.D.Kan. 1997).

Acknowledging the general rule, Holdings recognizes that the funds transferred from the accounts of Cruises and Maritime to the defendants were not its property. Moreover, at an earlier hearing, Holdings conceded that its judgment creditor could not have executed on the Cruises or Maritime accounts, or have forced Holdings to use the funds in those accounts to pay the judgment creditor. Finally, Holdings has not requested substantive consolidation,[4] and has not sought to pierce the corporate veil.

■ Instead, Holdings focuses on its ability to control Cruises's and Maritime's assets through its corporate governance rights. Holdings maintains that as sole shareholder of Cruises, it could amend Cruises's corporate by-laws, elect or remove its directors, appoint its officers, manage its business, and hence, control the disposition of its assets. By extension, Holdings could exercise these same powers with respect to Maritime, the wholly-owned subsidiary of Cruises. From this, Holdings concludes that the transfer of the funds effectively transferred those valuable control rights too. (*Regency Holdings (Cayman), Inc.'s Memorandum of Law in Opposition to Defendants'*

---

4. As noted above, Holdings and Maritime confirmed plans under which they have been substantively consolidated with other affiliates but not with each other. Further, Cruises has not confirmed a plan, and has not been substantively consolidated with either Holdings or Maritime.

*Motion for Summary Judgment,* dated Nov. 21, 1997, at 3–4.)

Holdings's theory, however, eviscerates the absolute priority rule, confusing what it can do with what it may legally do. In effect, Holdings advocates a *per se* rule authorizing a corporate parent to recover for the benefit of its own creditors a preferential or fraudulent transfer made by its subsidiary.[5] The creditors of the subsidiary, however, hold the superior claim to its assets, and a parent's *de facto* control does not mean it can legitimately use the subsidiary's assets to pay its own creditors. *Cf. Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.),* 127 F.3d 1195, 1200 (9th Cir.1997) (the ability of a sole shareholder to cause his corporation to pay his personal debt is circumscribed by his duties to the corporation and its creditors). The parent should be the last, not the first, to realize the benefit of recovering the subsidiary's transfer, but Holdings's *per se* rule reverses that priority.

Holdings's application of its rule is also conveniently myopic, and in the end, cannot work. Under Holdings's approach, Cruises should be the appropriate party to recover Maritime's transfers; Cruises directly controls Maritime through its ownership of 100% of Maritime's stock. Inexplicably, Holdings leapfrogs over Cruises and seeks to recover Maritime's transfer for the benefit of its own creditors. This suggests an implicit corollary to the Holdings *per se* rule: control of the subsidiary also means control over all of its corporate issue, *viz.,* grandchildren, great grandchildren, *etc.*

Holdings, however, sits in the middle of the corporate family hierarchy; it is not the ultimate parent and must answer to a higher authority. Rainbow owns Holdings, and under Holdings's logic, Rainbow could recover the transferred funds[6] because it controls Holdings and can force Holdings to cause Cruises and Maritime to pay Rainbow's creditors. Yet this is not the end. The Kriti Trust owns and controls Rainbow, and Captain Lelakis controls the Kriti Trust. Following Holdings's argument to its "logical" end, Lelakis controlled the funds.

Accordingly, to sustain the preference claim (at least for the Maritime transfers), the Holdings rule must permit it to recover the "transfer" of the control rights it could exercise only indirectly over subsidiaries of subsidiaries. More generally, the theory must recognize a bundle of intangible control rights held to varying degrees by each entity situated above Cruises and Maritime in the corporate hierarchy. Furthermore, under the theory, the transfer of the funds results in a transfer of each entity's control rights. If each entity were a debtor, each could maintain a preference claim, and recover the value of its control rights. Conversely, no entity, including Holdings, could recover an amount that exceeds the value of its own control rights. Thus, Holdings must prove the value of its own control rights.

Not surprisingly, Holdings cannot do this. Confronted at oral argument with this deficiency in its proof, Holdings proposed a convenient solution. It suggested that it should be permitted to recover all of the payments. Thereafter, the entities with the controlling interests could divvy up the recovery in accordance with the value of their respective interests.

This approach obviously begs the question. Holdings cannot cure its inability to prove its own loss by setting up the *jus tertii* of entities who, aside from Maritime, are not even parties to this adversary proceeding. Asserting the rights of a third party is the exception rather than the rule, and requires (1) a sufficiently close relationship between the litigant and the third party that the litigant can effectively assert the third party's rights, and (2) an obstacle to the third party's asserting its own rights. *Singleton v. Wulff,* 428 U.S. 106, 114–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976). The debtor

---

**5.** In fact, the Holdings rule is much broader. It would permit any person who controls another entity (*e.g.,* controlling shareholder of a nonwholly-owned subsidiary, general partner of a partnership) to recover the controlled entity's transfers.

**6.** Although Rainbow and those above it in the hierarchy are not debtors, they presumably could rely on the Holdings rule to bring nonbankruptcy suits under state fraudulent transfer laws to recover transferred control rights.

affiliates in the corporate chain can assert their own rights. Moreover, those who did not file bankruptcy petitions have no statutory right to recover a preferential transfer. As to these nondebtor affiliates, even if Holdings could assert their rights, they have no rights to assert.

In the end, the transfer of the funds did not affect Holdings's corporate governance rights. Following the transfer, Holdings remained the sole owner, directly of Cruises, and indirectly of Maritime, and could continue to govern their affairs to the same extent as before the transfers. Further, a Holdings judgment creditor could still levy on the Cruises shares, and exercise the corporate governance rights for its own benefit but subject to the same limitations. At most, the transfers diminished the underlying value of the Cruises shares, but this does not amount to a transfer of Holdings's property. *See In re Beck Indus., Inc.*, 479 F.2d at 416.

### C. Holdings's Authorities

Finally, the two cases on which Holdings principally relies do not support its argument that Holdings's ability to exercise corporate control over its subsidiary (and its subsidiary's subsidiary) permits it to recover the transfer of their assets. In *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir.1987), the debtor corporation's sole owner transferred funds into the debtor's account as part of a money laundering scheme. Within two days, the debtor used approximately half of the money to pay salaries and lawyers, and transferred the remainder in furtherance of the owner's various schemes. The trustee sought to avoid the latter payment as a fraudulent transfer.

The Eleventh Circuit held that the trustee could not avoid the payment, even though it was made with funds on deposit in the debtors' account. The debtor did not exercise sufficient control over the transferred funds to make them the debtor's property. On the contrary, the Court found the evidence of the sole owner's control of the transfer "overwhelming," and the debtor's connection to the funds "tangential." *Id.* at 1182. Here, too, Lelakis exercised similar control over Holdings and the other affiliates, and used

Holdings, as borrower, and Cruises and Maritime, as payors, to facilitate a transaction which benefitted other Lelakis corporations. Moreover, unlike the debtor in *Chase & Sanborn*, Holdings never even had a bank account or legal ownership of the transferred funds.

*Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir.1995), on which Holdings also relies, is similarly inapposite. There, the debtor-parent sought to avoid a transfer made to the president of one of its subsidiaries. The payment came from a cash management account containing the commingled funds of the debtor and its various affiliates. The bookkeeping entries allocated the payment to the subsidiary rather than the debtor. The Court nevertheless held that the funds were the property of the debtor's estate because the debtor held legal title to the account, possessed all of the indicia of ownership of the funds, and had the discretion to use the funds to pay its creditors. *Id.* at 1116–17.

In contrast, Holdings did not possess legal title or any indicia of ownership of the funds. Further, the funds were not commingled in a common account, and any discretion Holdings had to direct payment to its own creditors was circumscribed by the control rights of Lelakis and the affiliates situated between Lelakis and Holdings in the corporate hierarchy. Maritime and Cruises held legal title to the funds in their respective accounts, and like the subsidiary in *In re Southmark Corp.*, Holdings's only connection to the transferred funds is a series of bookkeeping entries. *(See Proffer,* ¶¶ 98, 100, 102.)

### CONCLUSION

For the foregoing reasons, the motion is granted and the preference claims brought by Holdings against the movants are dismissed with prejudice. The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) and 52(c), made applicable by Fed.Bankr.R. 7052.

Settle order on notice.