In re David SCHICK, Venture Mortgage Corp., and A & D Trading Group, L.L.C., Debtors.

Aurora Cassirer, Chapter 11 Trustee for the Estate of David Schick, Debtor, Plaintiff,

v.

Marvin J. Herskowitz, Defendant.

Bankruptcy Nos. 96 B 42902(SMB), 96 B 43969(SMB), 96 B 46282(SMB). Adversary No. 97/9182A.

United States Bankruptcy Court, S.D. New York.

May 28, 1999.

Parker Chapin Flattau & Klimpl, LLP, New York City, Joel L. Lewittes, Amos Alter, of counsel, for plaintiff.

Douglas T. Tabachnik, New York City, for defendant.

## POST TRIAL MEMORANDUM DECISION

STUART M. BERNSTEIN, Bankruptcy Judge.

The debtor, David Schick, owed $1,095,000.00 to the defendant, Marvin J. Herskowitz. Within ninety days of the petition date, Schick repaid Herskowitz from three sources: (1) accounts maintained in the name of Schick, (2) accounts maintained in the name of his law partnership, Schick & Simon LLP, and (3) from third parties sent at Schick's request. Schick's trustee commenced this adversary proceeding to avoid and recover the payments as preferential transfers, and the case was

tried on February 3, 1999. For the reasons discussed below, the trustee is entitled to avoid and recover payments in the aggregate sum of $645,000.00.

## BACKGROUND

This case has its origins in the practice of buying and selling pools of mortgages. The Federal Deposit Insurance Corporation ("FDIC") and the Resolution Trust Corporation pooled mortgages held by the banks they took over, and sold these pools at public auctions. (Trial transcript ("Tr.") 122–23.) Blackstone Associates, an entity represented by Schick, (id. at 78), often bid at the auctions.[1] (Id. at 125.) If Blackstone won the bid, it would place a "good faith deposit" with its own attorney (i.e., Schick), and conduct "due diligence" over a four to five month period. During this time, Blackstone would attempt to locate another buyer, and was usually able to "flip" the purchase at a profit. If it did not flip the deal, it closed it on its own. (Tr. 125–29.)

Blackstone sought out investors to fund the "good faith deposits." It first approached Herskowitz through his attorney, Edward Burnbaum, Esq., during the summer of 1995. In August 1995, Blackstone, Herskowitz and Schick entered into the first of their two transactions. Under their August 30, 1995 agreement, (Defendant's Exhibit ("DX") B), Herskowitz advanced $1.5 Million to Blackstone. Schick agreed to act as escrow agent, and he returned the money to Herskowitz, in accordance with the terms of the first agreement, at the end of December, 1995.[2]

On January 18, 1996, the same parties entered into a second funding agreement (the "Agreement"). (PX 1.) This time, Herskowitz agreed to deposit $1 million (the "Deposit"), and Schick again agreed to hold the sum as escrow agent in a designated trust account. The Agreement

---

**1.** The principals of Blackstone Associates were Abraham Taub and Uri Woldiger. (Plaintiff's Exhibit ("PX") 1, ¶ 7(f).)

**2.** As discussed below, one of the checks bounced but was replaced.

provided that the Deposit remained the property of Herskowitz. Further, the Agreement obligated Blackstone to pay a $50,000.00 fee, and deposit the $50,000.00 with Schick, also to be held in escrow (the "Additional Deposit").[3] Blackstone agreed to pay Herskowitz an additional $34,000.00 as compensation for his borrowing costs.

Schick, as escrow agent, was to hold the Deposit for "exactly one hundred and fifty days ... i.e., June 17, 1996," and then return it to Herskowitz. He could not transfer the Deposit or Additional Deposit to anyone else. Herskowitz had the right to demand the early return of the Deposit and insist on the payment of the Additional Deposit if Blackstone or a third party commenced an action to prevent their payment or "if any dispute arises of any nature with regard to the Deposit or Additional Deposit." Finally, Schick and Blackstone agreed to be jointly and severally liable for the payment of the Deposit and Additional Deposit.

Following the execution of the Agreement, Herskowitz delivered a $1 million check which Schick promptly lost. On January 26, 1996, Herskowitz made a replacement payment by wire transferring $1 million into the account designated in the Agreement. (See PX 2.) The Deposit spent only a brief moment there. Within a few days, Schick transferred the Deposit out of the account, (see id.), and by February 5, 1996, the account had a zero balance. (See PX 3.)

Around this same time, a problem developed with the parties' first transaction. Schick had sent Herskowitz a $400,000.00 check that bounced. Herskowitz learned about the bounced check in early February 1996, (Tr. 46, 114–15), and the check was eventually honored or replaced. (See id.

at 18.) However, as a result of the dishonored check and the lost $1 million check, Herskowitz became nervous. (Id.) In late February or early March 1996, he demanded the return of his investment. (Id. at 16.)

The parties have stipulated that during March 1996, Schick transferred or caused others to transfer $1,095,000.00 to Herskowitz. In addition to the (a) $1 million deposit, (b) $50,000 fee/"Additional Deposit" and (c) $34,000.00 cost of borrowing—all mentioned in the Agreement—Herskowitz also received $10,000.00 on account of a lost investment opportunity and $1,000.00 as lost interest on the misplaced $1 million check. (Amended Joint Pretrial Order, dated Dec. 17, 1998 ("JPTO"), at ¶ 5(b).)

The evidence showed three general sources of repayment: (1) escrow and trust accounts held in Schick's name, (2) escrow and similar accounts held in the name of his law firm, Schick & Simon LLP, and (3) payments from third parties (Sidney Borenstein and "Gondola"). The following amounts are attributable to each source:

| SOURCE OR NAME OF ACCOUNT | AMOUNT OF PAYMENT(S) |
|---|---|
| David Schick, Esq. "Escrow Account" | $126,000.00 [4] |
| David Schick, Esq. "Attorney at Law" | $244,000.00 [5] |
| Schick Simon, LLP IOLA Account | $400,000.00 [6] |
| Schick Simon, LLP "Attorney Escrow Account" | $ 50,000.00 [7] |
| Sidney Borenstein "Special Account" | $ 50,000.00 [8] |
| "Gondola" | $225,000.00 [9] |

Schick testified, at trial, that the accounts in the name of "David Schick" and his law firm, "Schick Simon LLP," were held out to clients and investors as trust or

---

**3.** The evidence does not reflect whether Blackstone made the Additional Deposit.

**4.** PX 5, 10, 15.

**5.** PX 6, 7, 16.

**6.** PX 9, 12, 13.

**7.** PX 11.

**8.** PX 8.

**9.** See PX 18, p. "009".

escrow accounts to give them comfort. (Tr. 88–89.) He did not mean to imply, by this, that he dealt with the accounts in that way. (*Id.* at 88.) In fact, he also deposited his own funds into the accounts. (*Id.* at 77.) The trustee now seeks to recover all of the payments.

## DISCUSSION

### A. Introduction

 This adversary proceeding involves the trustee's entitlement to recover preferential transfers under 11 U.S.C. § 547(b).[10] The trustee bears the burden of proof on her affirmative claim. *See* 11 U.S.C. § 547(g). The main issue concerns Schick's interest in the accounts and third party funds used to satisfy Herskowitz's claim. State law determines the extent of an interest in property, absent an overriding federal policy. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Morton v. National Bank of New York City (In re Morton),* 866 F.2d 561, 563 (2d Cir.1989); *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.),* 216 B.R. 371, 375 (Bankr. S.D.N.Y.1998). Bankruptcy law, however, determines whether that interest is "property of the estate." *In re Prudential Lines, Inc.,* 928 F.2d 565, 569 (2d Cir.), *cert. denied,* 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991).

 A preference action is designed to recover property that would have been available for distribution to creditors but for the transfer. *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46

(1990); *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.),* 97 F.3d 22, 25 (2d Cir.1996); *In re Regency Holdings (Cayman), Inc.,* 216 B.R. at 375. Accordingly, the scope of "property of the estate" in 11 U.S.C. § 541 determines the scope of property interests recoverable under section 547. *Begier v. IRS,* 496 U.S. at 58–59, 110 S.Ct. 2258; *In re Regency Holdings (Cayman), Inc.,* 216 B.R. at 375. "Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). If the debtor holds only legal title to the property, that is all that vests in the estate. 11 U.S.C. § 541(d). The equitable title or interest is neither "property of the estate" under section 541 nor "property of the debtor" under section 547(b). *Begier v. IRS,* 496 U.S. at 59, 110 S.Ct. 2258.

 The line between legal and equitable title becomes murky when a trustee or escrow agent commingles his beneficiary's funds with his own. Under New York law, the beneficiary of trust funds deposited into a commingled account must identify or trace his funds to retain his priority over unsecured creditors. *See Sonnenschein v. Reliance Ins. Co.,* 353 F.2d 935, 937 (2d Cir.1965) (collecting cases); *Bank Leumi Trust Co. v. Klein,* No. 92 Civ.2016, 1993 WL 403967, at *6 (S.D.N.Y. Oct. 7, 1993); *In re Hicks,* 170 N.Y. 195, 63 N.E. 276, 277 (1902); *In re Title & Mortgage Guarantee Co.,* 246 A.D. 435, 284 N.Y.S. 335, 338–39 (N.Y.App.Div.1935), *aff'd,* 270 N.Y. 629, 1 N.E.2d 364 (1936). The same tracing requirement applies under federal bankrupt-

---

**10.** Section 547(b) states:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

cy law. *See Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Sonnenschein v. Reliance Ins. Co.,* 353 F.2d at 936–37; *County of Orange v. Merrill Lynch & Co. (In re County of Orange),* 191 B.R. 1005, 1015 (Bankr. C.D.Cal.1996); *Beekman Paper Co. v. St. Theresa Properties, Inc. (In re St. Theresa Properties, Inc.),* 152 B.R. 852, 858 (Bankr. S.D.N.Y.1993). As the Second Circuit explained in a different context:

> [P]roperty converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankrupt estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to bankruptcy is a preference, except when made from the very property taken.... The rule applies even to property which the bankrupt had held in trust.

*Morris Plan Indus. Bank v. Schorn,* 135 F.2d 538, 539 (2d Cir.1943); *accord Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.),* 81 F.3d 592, 596 (5th Cir.1996); *McLemore v. Third Nat'l Bank (In re Montgomery),* 983 F.2d 1389, 1393 (6th Cir.1993); *Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 401–02 (4th Cir.1992); *Danning v. Bozek (In re Bullion Reserve of North Am.),* 836 F.2d 1214, 1218 (9th Cir.), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *In re Newpower,* 229 B.R. 691, 701 (W.D.Mich.1999).

■ Since the bankruptcy trustee has the burden of proof, the beneficiary's obligation to trace will not arise unless the bankruptcy trustee first carries her initial burden of going forward. Ordinarily, a bankruptcy trustee must demonstrate that the debtor had legal title to a bank account and control over its use, including paying his own creditors. *See Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.),* 75 F.3d 1447, 1451 (10th Cir. 1996); *Southmark Corp. v. Grosz (In re Southmark Corp.),* 49 F.3d 1111, 1116–17 (5th Cir.1995); *Sigmon v. Royal Cake Co.*

*(In re Cybermech, Inc.),* 13 F.3d 818, 820–21 (4th Cir.1994); *In re Bullion Reserve of North Am.,* 836 F.2d at 1217; Derek E. Feagans, Comment, *Concentration Accounts and Bankruptcy: "Where O' Where Did the Bankruptcy Estate Go?",* 67 U.Mo.–Kan. City L.Rev. 145, 150 (1998) ("*Concentration Accounts*"). "Control," for preference purposes, means the legal right to use the funds, *see In re Maple Mortgage, Inc.,* 81 F.3d at 596; *In re Newpower,* 229 B.R. at 701 ("Control, in other words, requires not only the physical means of exercising control, but also the authority to do so"); *Concentration Accounts,* 67 U.Mo.–Kan. City L.Rev. at 154–55, or as Judge Easterbrook stated on an analogous point, the right to invest the money in lottery tickets or buy uranium stock. *See Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890, 892 (7th Cir. 1988). "Control" does not mean the ability to steal the money, or use it for personal purposes in breach of duty.

■ In the case of commingled accounts, the bankruptcy trustee's burden of proof is affected by the beneficiary's burden to trace. The funds in a commingled account maintained in the debtor's name may be used to pay his unsecured creditors unless a beneficiary can trace his or her superior right in the funds. Thus, the law implies the element of "control" in the absence of tracing. Accordingly, the bankruptcy trustee carries her burden of proving that the account was property of the debtor by showing that the debtor had legal title to the account, and the account consists of commingled trust and personal funds. *See In re Advent Management Corp.,* 104 F.3d 293, 296 (9th Cir.1997); *Rine & Rine Auctioneers, Inc. v. Douglas County Bank & Trust Co. (In re Rine & Rine Auctioneers, Inc.),* 74 F.3d 854, 859–60 (8th Cir.1996); *In re Bullion Reserve of North Am.,* 836 F.2d at 1217 (funds in commingled account that could have been used to pay other creditors "presumptively constitutes property of the debtor's estate"). The burden then shifts to the de-

fendant (1) to show that the debtor held only legal title and (2) to trace the equitable owner's interest to the specific property at issue. With these principles in mind, we turn to the consideration of Schick's interest in the funds transferred to Herskowitz.

## B. Accounts Held in Schick's Name

■ Schick paid Herskowitz $126,000.00 from an account entitled "David Schick, Esq. Escrow Account" and an additional $244,000.00 from one entitled "David Schick, Esq. Attorney at Law." At trial, the trustee met her initial burden of demonstrating that the debtor owned the "David Schick" accounts. Schick unquestionably had legal title to these accounts. Further, the accounts were commingled, containing investor, client and personal funds.

As a result, the burden shifted to Herskowitz. Herskowitz does not contend and did not prove that he had an interest in the funds. He wired $1 million into Schick's Fleet Bank account on January 26, 1996, (PX 2, p. 7), but the account had a zero balance by February 5th. (PX 3.) Schick paid Herskowitz from accounts he maintained at the Republic National Bank of New York, (PX 5–7, 10, 15), and Chemical Bank. (PX 16.) Herskowitz failed to trace his deposit into those accounts, or to the other sources of repayment.

Rather, he asserts the rights of third parties in the funds. I assume he can do this only because the trustee has not contended otherwise. Herskowitz relies heavily on the title of the "escrow" account, and the use of both accounts for trust and escrow funds. He argues that this establishes that the accounts were not property of the debtor, and would not be property of the estate.

■ Although one of the accounts bears the name "escrow" account, such labels only suggest a fiduciary relationship, but are not conclusive. *See Merritt–Chapman & Scott Corp. v. Public Util. Dist.,*

237 F.Supp. 985, 994 (S.D.N.Y.1965); *Pan American World Airways, Inc. v. Shulman Transport Enters., Inc. (In re Shulman Transport Enters., Inc.),* 21 B.R. 548, 552 (Bankr.S.D.N.Y.1982), *aff'd,* 33 B.R. 383 (S.D.N.Y.1983), *aff'd,* 744 F.2d 293 (2d Cir.1984); *Surrey Strathmore Corp. v. Dollar Sav. Bank of New York,* 36 N.Y.2d 173, 366 N.Y.S.2d 107, 325 N.E.2d 527, 529 (1975); *Whiting v. Hudson Trust Co.,* 234 N.Y. 394, 138 N.E. 33, 36 (1923) (Cardozo, J.). Instead, the nature of the account depends on the rights and obligations intended by the parties. *See Surrey Strathmore Corp. v. Dollar Sav. Bank of New York,* 366 N.Y.S.2d 107, 325 N.E.2d at 529.

■ Herskowitz failed to prove a valid trust or escrow. Under New York law, an express trust of personal property requires (1) a designated beneficiary, (2) a designated trustee other than the beneficiary, (3) property sufficiently designated to allow title to pass to the trustee and (4) actual delivery or a legal assignment of the property with intent to pass legal title to the trustee. *Alithochrome Corp. v. East Coast Finishing Sales Corp. (In re Alithochrome Corp.),* 53 B.R. 906, 910 (Bankr. S.D.N.Y.1985) (citing *Brown v. Spohr,* 180 N.Y. 201, 73 N.E. 14 (1904)). No specific beneficiary or trust property was identified, and Herskowitz did not show that any specific funds were delivered to Schick with the intent that they be held in trust. Further, Schick testified that although he held the account out as a trust account, this did not mean that he dealt with it as a trust account.

■ Similarly, a valid escrow under New York law consists of three elements: (1) an agreement relating to the subject matter and the delivery of the deposit to the escrow agent, (2) the delivery of the deposit to the beneficiary upon the performance of an act or occurrence of an event, and (3) relinquishment of control over the deposit by the grantor. *Keene Corp. v. Acstar Ins. Co.,* 162 B.R. 935, 942 (Bankr. S.D.N.Y.1994). Herskowitz did not identify any agreement creating an escrow cov-

ering particular funds in the accounts. And again, notwithstanding the name of the account or how Schick held it out, his testimony implied that he did not treat its contents as escrowed funds.

Proof of a trust or escrow, furthermore, is not enough. Herskowitz must also trace the payments to the true or equitable owners. As stated, New York law does not grant a trust creditor a preference over general creditors merely because he is a trust creditor; he must follow and identify his funds. *In re Hicks*, 63 N.E. at 277. If Herskowitz had claimed an interest in the Schick accounts, that is, if he claimed that Schick paid him with his own money from the commingled accounts, Herskowitz would have to prove it. His burden of tracing is no less simply because he contends the money used to pay him belonged to third parties.

Herskowitz did not offer proof on this point. Accordingly, the trustee has sustained her burden of proving that the payments aggregating $370,000.00 made from the commingled "David Schick" accounts involved transfers of the debtor's interests in property that diminished his estate.

### C. The Schick & Simon Accounts

 Schick paid Herskowitz $400,000.00 from an account entitled "Schick Simon LLP IOLA Account" and another $50,000.00 from an account entitled "Schick Simon LLP Attorney Escrow Account." Schick was a partner in Schick & Simon LLP. Schick and his partner had signatory authority on these accounts. (Tr. 90.)

The trustee has failed to sustain her burden of proving that these accounts belonged to the debtor. First, Schick did not have legal title to his firm's account; under New York law, the accounts legally belonged to his firm. *See Ruta Exportaciones Agropecuarias Limitada v. Overseas Fruit Corp.*, 60 A.D.2d 802, 400 N.Y.S.2d 538, 539 (1978); N.Y. Partnership L. §§ 12, 51 (McKinney 1999). Second, although Schick had physical control

of the accounts and could use the funds for partnership purposes, he could not use the funds, absent an agreement with the partnership, to pay his personal expenses. *See* N.Y. Partnership L. § 51(2)(a).

In addition, all of the payments from the Schick & Simon accounts were traceable to the partnership, and the trustee did not trace any of Schick's own funds into those accounts. Schick & Simon's creditors, or its trustee were it in bankruptcy, would therefore have the right to follow those funds into the hands of Herskowitz. Conversely, Schick's trustee does not.

In conclusion, the trustee has failed to show that these payments should be excepted from the general rule that the partner's trustee cannot recover transfers of the partnership's property. *See Turner v. Central Nat'l Bank*, 468 F.2d 590, 591 (7th Cir.1972) (decided under the former bankruptcy act). Schick's creditors could not have looked to the Schick & Simon accounts for the payment of their claims, *see* N.Y. Partnership L. § 51(2)(c), and the transfers did not diminish his estate.

### D. The Sidney Borenstein and Gondola Payments

The final transfers under consideration were made by third parties to Herskowitz. Sidney Borenstein paid him $50,000.00, and Gondola wire transferred $225,000.00. The circumstances under which the trustee may recover third party payments are well settled. In the seminal case, *Smyth v. Kaufman (In re J.B. Koplik & Co.)*, 114 F.2d 40 (2d Cir.1940), the debtor entered into a settlement agreement with one of its creditors. The agreement called for an initial payment of $723.76, a $500.00 payment one week later, and five further installments of $500.00 each. *Id.* at 41. The first check bounced, and the debtor covered it with money borrowed from its landlord and its own personal funds. *Id.* When the second $500.00 payment came due, the debtor did not have the money. At its

request, the landlord, Childs, paid the debt. *Id.*

Following bankruptcy, the bankrupt's trustee sued to recover both payments as preferences. *Id.* On appeal to the Second Circuit, the defendants argued that most of the first payment and all of the second came from funds that were never part of the bankrupt's estate. The bankrupt had borrowed $500.00 from the landlord to make the first payment. The landlord had made the second payment directly, and the money never passed through the bankrupt's hands. *Id.* at 42.

The Court rejected the challenge to the first payment because the landlord did not loan the $500.00 to the bankrupt on the condition that it pay the specific creditor. *Id.* More important to the present case, the Court reached the same conclusion as to the second payment, finding the two situations legally indistinguishable. It ruled that the third party funds were property of the debtor because the debtor was able control their application through its designation of how the funds would be used:

> We cannot see any essential difference between this payment and the first one. The only interest Childs had in lending the money to [the bankrupt] was to keep the latter in business so that its lease would continue and its rent would be paid. There is no evidence that he conditioned this loan, any more than the first one, upon the payment of any particular creditor or that he cared who was paid. We believe the arrangement was such that [the bankrupt] rather than Childs designated the creditor to be paid and controlled the application of the loan which it secured from its landlord. The existence of this control determines whether the payments were preferential transfers by the bankrupt or were pay-

ments by a third party who did not make the loans generally but made them only on condition that a particular creditor receive the proceeds. The transfer here was not of special funds designated as such by the lender which could never have become generally available to all of the creditors.

*Id.*

Under *Smyth,* therefore, a payment made by a third party to a creditor of the debtor will amount to a transfer of the debtor's property "when the payment represents a loan by the third party *to the debtor and the debtor, rather than the lender, designates the creditor to be paid and controls the application of the loan.*" 5 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 547.03[2], at 547-24 (rev. 15th ed.1999) (citing *Smyth* ); *accord In re Smith,* 966 F.2d 1527, 1533 (7th Cir.), *cert. dismissed,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992). Conversely, when the third party lends money to the debtor for the purpose of paying a specific creditor that the lender designates, the funds are "earmarked," do not become property of the debtor and cannot be recovered by the trustee. *See In re Kelton Motors, Inc.,* 97 F.3d at 25; *In re Smith,* 966 F.2d at 1533.

The Borenstein payment satisfies the *Smyth* criteria. Schick told Borenstein that he needed to borrow $50,000.00 for a short time,[11] (Tr. 8), and asked Borenstein to prepare a $50,000.00 check payable to Herskowitz. (*Id.* at 8, 58–60.) Schick's agent picked up the check, brought it back to Schick, and Schick caused the check to be deposited in Herskowitz's account at Chemical Bank. (Tr. 60–61, 68–69; PX 18.)[12] Schick designated the transferee, and Borenstein did not

---

11. Schick repaid Borenstein four days later. (*See* PX 17.)

12. Herskowitz questioned whether he received the $50,000.00; he was not sure. (Tr. 30–31.) But Schick testified credibly on this

point, and more important, Herskowitz's own Chemical Bank records indicate a $50,000.00 deposit on March 15, 1996, the date of the Borenstein check. (PX 14–B.)

condition the loan on using it to pay Herskowitz.

The same result applies to the Gondola payment. Gondola was run by Borenstein who was a money manager. (Tr. 90.) Schick testified that he sometimes borrowed money from Gondola on a short term basis and also received money from Gondola on behalf of third parties. (*Id.*) To the best of his recollection, the $225,000.00 represented a short term loan that he asked Gondola to make. (*Id.* at 91.) Based on this request, Gondola wired the funds directly into Herskowitz's account (PX 18, p. "009".)

As with the Borenstein payment, the Gondola payment is deemed to be a loan to Schick. Schick designated its application, and Gondola did not condition the loan on using it to pay Herskowitz. Under *Smyth* and its progeny, the Borenstein and Gondola payments, aggregating $275,000.00, represent transfers of property of the debtor that may be recovered by the trustee.

### E. Herskowitz's Other Arguments

■ In order to recover any payments to Herskowitz, the trustee must also establish the other elements of her preference claim. Prior to trial, the parties disputed only one element—whether Schick made the payments on account of an antecedent debt. (*See* JPTO ¶ 7(h).)[13] Herskowitz argued that Schick had prepaid an obligation not yet due, and this could not be an antecedent debt. (Tr. 176–77.) Her-

skowitz did not brief this argument in his post-trial memorandum, and it is not clear that he is still pressing it.[14]

■ Herskowitz's argument nonetheless lacks merit. A debt is incurred, for purposes of 11 U.S.C. § 547(b)(2), when it arises and not when payment becomes due. *In re Futoran,* 76 F.3d 265, 267 (9th Cir.1996); *Intercontinental Publications, Inc. v. Perry (In re Intercontinental Publications, Inc.),* 131 B.R. 544, 549 (Bankr. D.Conn.1991); *compare* 11 U.S.C. § 101(5)(A) (defining "claim" to include a contingent or unmatured right to payment) *with* 11 U.S.C. § 101(12) (" 'debt' means liability on a claim"). Schick's obligation to pay in the future arose when the parties signed the Agreement in January 1996. The transfers in March 1996 satisfied this antecedent debt. But even under Herskowitz's theory, the debt became presently due when Herskowitz demanded the return of his deposit in late February or early March. The payments—other than the first $1,000.00—were made during the third week in March, and therefore, would be on account of an antecedent debt.

■ Finally, Herskowitz has, in the past, raised the defense that the payments were made in the ordinary course of business.[15] Section 547(c)(2) provides:

The trustee may not avoid under this section a transfer . . . to the extent that such transfer was—

13. The other elements are undisputed. Herskowitz is a creditor, 11 U.S.C. § 547(b)(1), the payments were made while Schick was insolvent, *id.,* § 547(b)(3), because Schick is presumed to have been insolvent at the time, *see id.,* § 547(f), the payments were made within 90 days of the petition date, *id.,* § 547(b)(4)(A), and the parties stipulated at the beginning of the trial that § 547(b)(5) was satisfied. (Tr. 4.)

14. The trustee contends that Herskowitz abandoned this argument as well as his defense that the transfers were made in the ordinary course of business. (*Plaintiff's Post–Trial Reply Brief,* dated Mar. 30, 1999, at 2–3.)

Herskowitz's counsel wrote me an April 6, 1999 letter in which he pressed other arguments but did not respond to the trustee's contention.

15. Herskowitz had also raised the defense of contemporaneous exchange for value prior to trial. (*See* JPTO ¶ 7(i), (j).) He did not offer evidence or brief this issue, and accordingly, I consider it abandoned. If he did not intend to abandon it, he failed to prove it because there was no substantially contemporaneous exchange-Schick received the $1 million in January 1996, and repaid Herskowitz in mid-March.

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The defendant bears the burden of proving each element of this defense by a preponderance of the evidence. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 39 (2d Cir.1996); *see* 11 U.S.C. § 547(g).

■■■ Turning to subsection (B), the court must make a factual inquiry into the prior dealings between the parties. *McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 34 (N.D.N.Y.1997), *aff'd* 142 F.3d 571 (2d Cir. 1998). "[T]he cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." *WJM, Inc. v. Massachusetts Dep't of Pub. Welfare*, 840 F.2d 996, 1011 (1st Cir.1988) (quoting *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986)); *accord McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103, 111 (Bankr.E.D.N.Y.1995); *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 736 (Bankr.W.D.Va. 1995). The creditor must establish a "baseline of dealings" to enable the court to compare the payment practices during the preference period with the prior course of dealing. *Ellenberg v. Tulip Prod. Poly-merics, Inc. (In re T.B. Home Sewing Enters., Inc.)*, 173 B.R. 782, 788 (Bankr. N.D.Ga.1993). The relevant comparisons relate to the amount of the payments, the timeliness of the payments, the existence of any unusual debt collection practices and the form of, and the circumstances surrounding, the payments. *In re Vogel Van & Storage, Inc.*, 210 B.R. at 35; *see Hassett v. Goetzmann (In re CIS Corp.)*,

195 B.R. 251, 258 (Bankr.S.D.N.Y.1996); *In re Lan Yik Foods Corp.*, 185 B.R. at 111.

■■ Two features mark these transfers as extraordinary. First, Schick prepaid the Deposit and other amounts three months early at Herskowitz's insistence. In the previous transaction, Schick repaid Herskowitz at the approximate time that the repayment was due under the contract. Second, the circumstances surrounding the repayment were irregular and unusual. Herskowitz demanded the early repayment because Schick bounced a $400,-000.00 payment relating to the first transaction, and lost Herskowitz's $1 million check in the second deal. Herskowitz testified at his deposition that he demanded the early repayment because Schick "got very sloppy," (Tr. 17), and he "didn't want to continue with him." (*Id.* at 18.)

At trial, Herskowitz pinned this defense on his contractual right to demand repayment "if any dispute arises of any nature with regard to the Deposit or Additional Deposit." (PX 1, ¶ 4(c).) The factors he cites, however, do not create a "dispute" within the unambiguous terms of the Agreement. To begin with, the bounced check related to a deposit under an entirely different agreement. Furthermore, the Deposit, taking the form of a wire transfer, was the substitute for the lost check, and the lost check cannot, therefore, be the Deposit. In addition, Herskowitz's contractual right to demand the money when unusual circumstances exist does not make the repayment usual.

Finally, Herskowitz waived the right to rely on the lost check as a contractual basis to demand the early return of the Deposit. He sent the Deposit with full knowledge of the lost check. Relying in part on the same lost check he demanded the return of his money after less than two months. He claims he earned and undeniably received significant fees notwithstanding the prepayment. (*See* Tr. 142.) In fact, on an annualized basis, the additional

$95,000.00 payment he received equates to an approximate 60% return on his $1 million investment. Herskowitz had the choice to forego his investment and give up the fees, or make the investment and earn them. Somehow, he managed to do both.

## CONCLUSION

The plaintiff is entitled to avoid and recover transfers aggregating $645,000.00 from the defendant. The foregoing shall constitute my findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a). The plaintiff is directed to settle a judgment on notice to the defendant.