**In re Thomas J. EARLE, Jr.,
Mary G. Earle, Debtors.**

**Premier Capital Funding,
Inc., Plaintiff,**

v.

**Mary G. Earle, individually, and Thomas J. Earle, III, and Elizabeth E. Corbett, as trustees of the Earle Residence Trust, Defendants.**

**Bankruptcy No. 01–15875.
Adversary No. 02–1053.**

United States Bankruptcy Court,
S.D. Alabama.

May 13, 2002.

Henry A. Callaway, III, Mobile, AL, for Premier Capital Funding.

David S. Moyer, Mobile, AL, for the Debtors/Defendants.

ORDER AND FINAL JUDGMENT GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS AND DISMISSING WITH PREJUDICE PREMIER CAPITAL FUNDING'S FRAUDULENT TRANSFER CLAIM, SUSTAINING IN PART AND OVERRULING IN PART PREMIER CAPITAL FUNDING'S OBJECTION TO CONFIRMATION, DENYING WITHOUT PREJUDICE PREMIER'S MOTION TO CONVERT, AND MOOTING THE DEFENDANTS' OBJECTION TO RENTAL VALUE EVIDENCE

MARGARET A. MAHONEY, Chief Judge.

This matter is before the Court on (1) confirmation of the debtors' chapter 13 plan and Premier Capital Funding, Inc's ("PCF") objection to confirmation, and (2) PCF's complaint to avoid an alleged fraudulent transfer of real property. After the debtors filed this chapter 13 bankruptcy, PCF instituted an adversary proceeding against Mary G. Earle, one of the debtors, and Thomas J. Earle, III and Elizabeth E. Corbett, the debtors' children. PCF contends that debtor Mary Earle fraudulently transferred certain real property to a trust "with actual intent to hinder, delay, or defraud creditors in violation of Ala.Code § 8–9A–4(a)." (Complaint, ¶ 7). The debtors' children are trustees of the trust at issue. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (L) and the Court has the authority to enter a final order.

The Court held a hearing on April 26, 2002 on confirmation of the debtors' plan, PCF's objection to confirmation, and PCF's complaint to avoid fraudulent transfer. PCF presented its evidence first. At the close of PCF's case-in-chief, defendants' counsel moved for a directed verdict as to PCF's fraudulent transfer claim. In addition, the defendants raised an evidentiary objection to certain rental value evidence offered by PCF, and PCF moved to convert the Earle's chapter 13 to a chapter 7 case. The Court has carefully considered the record, PCF's brief, and applicable law, and for the reasons indicated below, is granting the defendants' motion for judgment as a matter of law; is dismissing with prejudice PCF's fraudulent transfer claim; is sustaining in part and overruling in part PCF's objection to confirmation; is denying without prejudice PCF's motion to convert; and is mooting the defendants' objection to the admissibility of rental value evidence.

FACTS AND PROCEDURAL HISTORY

The Earles' Chapter 13

Thomas J. Earle, Jr. and Mary G. Earle filed this chapter 13 case on November 26, 2001. The Earles' Summary of Schedules shows total assets of $ 38,303 and total liabilities of $165,280.93. On Schedule A (Real Property), Mrs. Earle listed a life

estate in a house located at 67755 State Highway 59 in Stockton, Alabama ("Stockton property" or "Stockton house"). The current market value of her interest is listed as $ 5,000. The Stockton house is shown as an asset of the Earle Home Trust, which will be discussed in more detail later in the Court's order. On Schedule A, Mr. Earle disputes having any interest in the Stockton house, but due to PCF's allegations, states that Mr. Earle may have a "disputed interest." Mr. Earle's "interest" is listed as a life estate having a value of $5,000.

The debtors also listed on Schedule A an unvested one-fifth interest (by virtue of the Arthur Gonzales Trust discussed later in this order) in two parcels of property, one located at 1861 Government Street in Mobile and the other located in Point Clear, Alabama. The value of each one–fifth interest is listed as $1.00. Both Mr. and Mrs. Earle claim their interests in the Stockton house as exempt in the amount of $5,000 on Schedule C (Property Claimed As Exempt).

The bulk of scheduled debt was, according to the Earles' petition, incurred in 2000 and 2001. Schedule E (Creditors Holding Unsecured Priority Claims) lists a tax debt to the United States incurred in 1988 by Mr. Earle in the amount of $17,125 (the IRS debt is listed as a "fine"). On Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Earles list a disputed claim amount of $102,391.26 owed to PCF arising from a judgment PCF obtained in 2000 in the Circuit Court of Mobile County. The total unsecured debt listed on Schedule F is $122,310.49. The debt representing the difference between the total and the judgment debt to PCF consists mainly of debt incurred in 2001 for credit card purchases, dental work, cell phone expenses, legal fees and an open account.

The Earles filed their chapter 13 plan on December 3, 2001. The Earles' plan proposes to pay $387 per month to the chapter 13 trustee. The plan offers a monthly "preference payment" of $300 to Carmel Investments on a total secured claim of $18,000. The plan also offers to pay the United States $25 per month on the fine, with the balance of the fine to survive discharge. Under the plan, all nonpriority unsecured claims are to receive nothing— i.e., it is a 0% composition plan. The Earles' combined monthly income, according to Schedule I, is $1,395.04. The Earles list total monthly expenses of $1,008 on Schedule J as follows: $140 for electricity, $55 for telephone, $150 for food, $25 for medical and dental expenses, $454 for health insurance, and $184 for automobile insurance. Schedule I shows that the Earles work at M & E Salvage, LLC, a scrap iron and salvage business owned by the Earles.

PCF filed an objection to the Earles' plan on December 19, 2001. On January 28, 2002, PCF filed a motion requesting that PCF be allowed to file and pursue on behalf of the chapter 13 trustee, an adversary proceeding seeking to recover the Stockton house and property for the benefit of the Earles' bankruptcy estate, which PCF alleges was fraudulently transferred by Mrs. Earle to the Earle Residence Trust. PCF's motion was granted by the Court on February 27, 2002.[1]

The Adversary Proceeding Filed by PCF

PCF filed its complaint to avoid fraudulent transfer on March 19, 2002. The defendants are Mary Earle (one of the debtors) and Thomas Earle, III and Elizabeth Corbett, the debtors' children. PCF's ac-

---

1. Thus, there is no issue concerning PCF's standing to assert a fraudulent transfer claim for the benefit of the Earles' bankruptcy estate.

tion is brought pursuant to 11 U.S.C. § 544(b)(1), which allows a trustee to set aside fraudulent transfers under applicable nonbankruptcy law. It is PCF's contention that debtor Mary Earle fraudulently conveyed the Stockton property (which is where the debtors live) to the Earle Residence Trust in violation of Alabama Code § 8–9A–4(a). Debtor Mary Earle and the other defendants filed their answer to PCF's complaint on March 26, 2002. The defendants raise three "affirmative defenses": (1) the transfer of the Stockton property was not fraudulent because it was done as a valid estate planning vehicle; (2) PCF has "unclean hands"; and (3) no action alleged by PCF amounts to an attempt to hinder, delay, or defraud creditors under Alabama Code § 8–9A–4(a).[2]

The Court held a joint hearing on the trial of PCF's complaint and on confirmation of the debtors' plan on April 26, 2002.[3] The evidence presented to the Court reveals the following additional facts pertinent to confirmation and the alleged fraudulent transfer.

The 1998 Earle Residence Trust

Mr. and Mrs. Earle (debtors) have lived in the house located at 67755 Highway 59 North, Stockton, Alabama 36579 since the 1970s. The Stockton house is a 3,422 square foot ranch style home with an enclosed 788 square foot porch, double carport, and open concrete patio. The house is located in a rural portion of North Baldwin County at least 8–12 miles north of Stockton near Blacksher, Alabama. There is a detached 47 foot by 27 foot wood frame barn and separate 20.5 foot by 24.5 foot wooden storage shed on the property, which consists of approximately 13 acres.

Mrs. Earle's mother-in-law deeded Mr. and Mrs. Earle the Stockton property in 1976. The Stockton property was sold for taxes in June 1994 to Hansel Prescott. Mr. Prescott obtained a tax sale deed in October 1997 from the Baldwin County Probate Court, which he recorded. In December 1997, Mrs. Earle redeemed the property and obtained a quit claim deed from Mr. Prescott, the tax sale purchaser, wherein the property was put in Mrs. Earle's name only. The property had been in Mr. and Mrs. Earle's names jointly prior to the tax sale. A copy of the quitclaim deed from Hansel Prescott to Mary Earle dated December 22, 1997 was placed into evidence. The quitclaim deed was recorded in the Probate Court of Baldwin County on December 22, 1997. After the tax sale, Mr. Earle had no further interest in the Stockton house.

On June 26, 1998, Mary Earle formed a trust called the Earle Residence Trust. Mary Earle is the grantor and the debtors' children, Elizabeth Corbett and Thomas J. Earle, III, are the trustees. The trust recites that it is a qualified personal residence trust ("QPRT") as described in I.R.S.Code § 2702 and was recorded in the Baldwin County Probate Court on July 7, 1998 at Real Property Book 837, pages 533 to 547. The trust document is 14 pages long and contains many provisions unnecessary to set forth for purposes of the Court's ruling, but several aspects of the trust bear mentioning. Mary Earle conveyed the Stockton property to the trust. As the Court understands the trust agreement, Mary Earle is granted a life estate and has the exclusive right to live rent free in the Stockton house as a personal resi-

---

**2.** At trial, the defendants abandoned their alleged "unclean hands" defense.

**3.** On the morning of trial, the United States withdrew its objection to the debtors' plan on

terms outlined in a withdrawal of objection to confirmation pleading filed in open court by Assistant United States' Attorney Charles Baer.

dence until the earlier of her death or the expiration of 20 years. If Mrs. Earle dies prior to the expiration of the 20–year term, the Stockton property goes back into Mrs. Earle's estate to be distributed accordingly. If Mrs. Earle survives the 20 years, then the Stockton property is conveyed to Mrs. Earles' children, who have a remainder interest in the property. If the house ceases to be Mrs. Earle's personal residence, the trust agreement requires that the house be sold with the proceeds of the sale used to purchase an annuity payable to Mrs. Earle on terms set forth in the trust.

At the time the Earle Residence Trust was created, the Stockton property was Mrs. Earle's primary asset. The only other assets of any significant value that Mrs. Earle had at the time were a car, her clothes, some furniture, and her interest in another trust formed by her father in 1984 (the Gonzales Trust). Mrs. Earle pays the utilities on the Stockton property. For the last two years, her daughter has paid the taxes. Mrs. Earle testified that she did not remember whether her children paid any "consideration" for the trust conveyance.

1999 Loan From PCF and PCF's Subsequent

Prebankruptcy Collection Efforts

In August 1999, the debtors and M & E Salvage (the Earles' scrap iron business) borrowed $64,000 from PCF. A copy of the promissory note evidencing this indebtedness was admitted into evidence. PCF is a company owned by J. Roe Burton and Jim Posey.

Mr. Burton is the president of PCF. Burton has been in the investment business for 30 years and his business is located at 165 North Beltline Highway in Mobile. Mr. Burton testified that the 1999 loan from PCF was not the first time that the Earles had borrowed money. According to Burton, the 1999 loan was a "refinancing" of an earlier loan that occurred in 1995. Burton and the Earles were friends in 1995. The Earles wanted funding for a project to be done by M & E Salvage near the Theodore Industrial Canal. According to Burton, he loaned the Earles $46,500 in 1995 for this project, and the agreement between Burton and the Earles was that the debt was to be repaid with any profits from the Theodore Industrial Canal project to be split evenly with Burton.

After the project was finished, Burton's relationship with the Earles continued through Mr. Posey. More money was loaned to the Earles in the 1999 transaction, and Burton testified that the earlier 1995 loan from Burton was "transferred" to PCF. Thus, Burton believes that the Earles have owed him and/or PCF money since 1995. Mrs. Earle testified that she did not know when she first borrowed the money and she did not know whether the 1999 transaction was a new loan or a refinancing of existing debt.

A copy of a Bank of Mobile cashier's check no. 038704 dated April 20, 1995 purchased by J. Roe Burton in the amount of $46,500 payable to Mary Earle and M & E Salvage Co., LLC was placed into evidence. Mr. Burton testified that this cashier's check represented the 1995 loan transaction and that Mary Earle was indebted to him in the amount of $46,500 in April 1995. Mrs. Earle testified that she did not know and could not answer whether the cashier's check represented a loan to her in 1995.

There was no promissory note in favor of PCF or Burton other than the August 1999 note placed into evidence. There are no recitals anywhere in the 1999 note referencing earlier debt and/or that the 1999 note is a refinancing of earlier indebtedness. And, there were no writings evi-

dencing a "transfer" from Burton to PCF of any alleged earlier indebtedness (i.e., prior to 1999) of Mrs. Earle and/or M & E Salvage to Burton. Burton testified that he "feels confident" that he has a note evidencing the 1995 transaction. He stated that the 1995 note was "in storage" and he did not have time prior to trial to locate it.

PCF filed a collection lawsuit in 2000 against M & E Salvage and the Earles in the Circuit Court of Mobile County. On January 5, 2001, PCF obtained a judgment against the Earles and M & E Salvage in the amount of $ 87,446.70 plus $176 in court costs. PCF recorded a certificate of judgment in the Baldwin County Probate Court on February 5, 2001. Mr. Burton did not find out that the Earle Residence Trust had been formed and the Stockton property transferred by Mrs. Earle to the trust until after PCF had obtained a judgment against Mrs. Earle. Burton did not search the Baldwin County Probate Court records prior to the 1999 promissory note transaction. He felt that the loan was appropriate because he thought that the Earles owned the Stockton house and that "their family" were "large landowners." Burton would have found out about the Earle Residence Trust had he performed a Baldwin County Probate Court search prior to the 1999 loan. PCF began post-judgment collection efforts and in November 2001 instituted sheriff's sale proceedings in Baldwin County to levy on Mrs. Earle's interest in the Gonzales Trust. The sheriff's sale was halted by the filing of Mrs. Earle's chapter 13 petition.

Pre–Earle Residence Trust Formation Events

Attorney Sarah Frierson's Testimony

The Earle Residence Trust document was drafted by Mobile attorney Sarah Frierson at no charge to Mrs. Earle. Frierson's deposition testimony taken in the adversary proceeding was admitted into evidence. Ms. Frierson has been a licensed practicing attorney for a little over 29 years. Her office is located at 3280 Dauphin Street, and her practice areas are mainly estate planning, will, trusts, and family matters. Ms. Frierson has known the debtor Mary Earle since the early 1990s, and members of her family even longer. Ms. Frierson represented Mary Earle's father, Arthur Gonzales, Sr., having prepared his will in the 1980s. Frierson handled the Gonzales estate after Mr. Gonzales died. She had also done legal work for Mary Earle's mother-in-law, Martha Earle. She prepared Martha Earle's will, did trust documents for Martha Earle, and handled legal matters in Martha Earle's estate after Martha Earle's death in 1997. The debtor Mary Earle was the executor of her mother-in-law Martha Earle's will, and Frierson had represented Mary Earle in that capacity.

Mrs. Frierson did not recall any specific conversations with Mary Earle regarding the reason for formation of the Earle Residence Trust, and her file did not contain notes of any meetings between her and Mary Earle. Frierson testified, however, that when Martha Earle died in 1997 and her estate tax return came due in January 1998, "there were a lot of issues going on at that time concerning Mrs. Earle's estate, the fact that she owed so much estate taxes, where the money was going to come for paying that estate tax." Mary Earle (who was Martha Earle's estate executor) called Frierson. Frierson testified that Mary Earle had been talking to Xavier Hartmann (the Earles' current accountant and the accountant for Martha Earle's estate), and Frierson assumed "that from what she [i.e., Mary Earle] told me, Mr. Hartmann had recommended that it would be a good idea for her to do" a qualified personal residence trust in an effort to

reduce Mary Earle's potential estate tax liability. According to Frierson, these type of personal residence trusts were "kind of popular" back in 1998 and Frierson had heard people discuss these trusts at seminars, although Frierson had never prepared such a personal residence trust document before.

Frierson kept no notes of conversations with Mary Earle's accountant, Xavier Hartmann, regarding the formation of the trust, but testified as follows concerning conversations with Hartmann:

Q: Did you talk directly with Mr. Hartmann at any time?

A: I feel like I talked to Xavier at that time, and I feel like even though my files do not reflect it—because I was talking to him about Ms. Earle's [i.e., Martha Earle's] estate tax return, and I was talking to other people about raising money, and there were a lot of conversations going on at this point in time dealing with Ms. Earle's estate and the money to pay her estate taxes, and I feel like that I had some type of conversation and would have probably sent a draft of this trust document to Xavier to make sure that this was what he wanted Mary to have.

Q: You don't have a specific recollection, but you think you probably did or probably would have?

A: Yeah. Because I deal with Xavier on other estates and things, and, you know, we usually exchange—I send him copies of documents that I'm working on when his clients are involved with it.

Frierson testified that based upon Xavier Hartmann's recommendation, Mary Earle came to Frierson and told Frierson that she wanted a trust, that Hartmann had "recommended that she do a qualified personal residence trust." Frierson also testified that Frierson didn't "think it [i.e., the trust] was something that she [i.e., Mary Earle] thought up of her own." Frierson stated the trust "was an idea that Mr. Hartmann put in" Mary Earle's "head." Earle came to Frierson and asked if she would prepare the trust document, and Frierson did. Frierson did remember having general discussions about the idea behind a personal residence trust, which is to reduce estate liability by making what amounts to a gift of a personal residence at a reduced amount, thereby removing the value of the house out of one's estate. The transaction is treated as a present gift of the value of the remainder interest to the trust beneficiaries. Normally, no gift tax is due (although a gift tax return must be filed) because one may simply use part of one's lifetime gift tax exemptions. The transaction is valued for gift tax purposes according to IRS formulas as a gift of the value of the remainder interest.

Essentially, Frierson's role was to draft the trust document and she was not formally retained to advise Mrs. Earle about the pros and cons of such a trust. Frierson assumed because Hartmann was more familiar with Mary Earle's assets that if the trust was something he recommended, it was a good idea for Mary Earle. Frierson relied upon Hartmann to determine whether Mary Earle needed the personal residence trust.

Frierson did not have any discussions with Mary Earle about protecting the Stockton property from creditors by forming the Earle Residence Trust. In fact, Frierson testified that she did not "remember any discussion with Mary about her creditors or Tommy John's creditors." Debtor Tommy Earle's mother did, however, talk to Frierson one or two times about the fact that Tommy Earle had experienced financial problems over the years. Frierson assumed that this—Mr. Earle's financial problems—is why the Stockton property was in Mary Earle's name only.

Frierson had no specific recollection of Mary Earle telling Frierson that the Stockton property had been sold for taxes, that Mary Earle had to redeem it, or that Mary Earle was worried about those events.

**Mary Earle's Post–PCF Judgment Deposition and Adversary Proceeding Deposition Testimony**

### Post Judgment Deposition

Mary Earle's deposition was taken on September 5, 2001 by PCF's counsel in the Circuit Court of Mobile County collection lawsuit. Selected pages of that deposition were placed into evidence. When asked why she placed the Stockton property in trust in 1998, Mrs. Earle recounted the events surrounding the tax sale and subsequent redemption and testified that "at that time I said I'm not going to go through this again, I'm giving this house to my children. So I gave it to my children. I mean, I did this [i.e., the trust] after that." She later testified as follows when asked what she meant by "this" when she said "I'm not going to go through this again": "I—I didn't want the same thing to happen as before with the taxes, the same kind of thing happening. That's it. I mean, I don't know what else to say." Several pages later, Mrs. Earle testified as follows:

> Q: Well, you told me that the reason it was set up was so the property couldn't be sold for nonpayment of taxes again, and I think it still can. That's why I'm wondering why it was set up that way.
> A: No, I—wait a minute. I don't know that I meant that it was done for nonpayment of taxes. I just—I was just trying to secure something for my children and not worry about our house, and that's why it was done.
> Q: In other words, it was to protect the house from creditors?

> A: Well, no. I mean, I didn't do it for that intention.
> Q: It's just worked out that way?
> A: Yeah.

### Adversary Proceeding Deposition

Mary Earle's deposition was taken in the adversary proceeding on April 4, 2002, and selected excerpts were admitted into evidence. Essentially, Mrs. Earle's testimony was that she relied on what Sarah Frierson told her in setting up the Earle Residence Trust. When asked if the purpose of the trust was to minimize estate taxes, Mrs. Earle testified as follows: "I don't know that. I just depended on Sarah to do what I—what she thought was the best thing to do. I don't remember that." Mrs. Earle further testified that she did not tell Mrs. Frierson that she was concerned that other creditors might be able to reach the house if it stayed in her name. Moreover, Mrs. Earle testified that "I didn't—I wasn't—I didn't have any creditor problems, so that wasn't—that—that wasn't what I was thinking." Mrs. Earle was unsure whether any gift tax return was filed after the trust was formed. To her knowledge, there was no gift tax return filed for 1998. She was, however, sure that she did not pay any gift taxes.

### Mary Earle's Assets

### The Gonzales Trust

Mary Earle's father was Arthur Gonzales, Sr., who is now deceased. Mr. Gonzales created a trust in February 1984 called the Arthur S. Gonzales Revocable Trust ("Gonzales Trust"). Mary Earle is one of the beneficiaries of the Gonzales Trust along with her four siblings. A copy of the Gonzales trust agreement was put into evidence. Under the trust, Mrs. Earle has a one-fifth interest in the two parcels of property in the Gonzales Trust,

one located at 1861 Government Street in Mobile and the other in Point Clear, Alabama. The properties in the Gonzales Trust will go to Mrs. Earle and her siblings upon the death of her stepmother, who is now around 60 years old.

## Government Street Property

The Government Street property held by the Gonzales Trust is a commercial site located at the intersection of Rickarby and Government Streets. The property has 112 frontage feet on Government and 146 frontage on Rickarby. It currently has a gas station and convenience store (Citgo Convenience Mart) located on it. The lot has a total area of 16,500 square feet. The property is leased to McGuire Oil with an escalating rent provision. McGuire now pays $600 per month in rent under the ground lease, and McGuire pays the taxes and insurance. Under the lease, all improvements belong to the tenant and subtenant. The one-story masonry building used for the convenience store is 1,360 square feet and was built somewhere around 1970 to 1975.

Mr. Frederick Hall, an appraiser with M.D. Bell Company, testified concerning the value of the lease on the Government Street property. Mr. Hall's appraisal report was placed into evidence. Mr. Hall opined that the present value of the McGuire Oil lease using a 10% rate of return as a discount rate is $72,000 based upon the escalating rentals that will be due from McGuire Oil under the lease. Under the lease, the yearly rent due through the year 2007 is as follows:

| | | |
|---|---|---|
| Nov | 2001–2004 (sic) | $ 7,200 |
| | 2004 | 9,000 |
| | 2005 | 10,200 |
| | 2006 | 11,400 |
| | 2007 | 12,600 |

Mrs. Earle testified that the rent received from the Government Street property goes to pay the expenses necessary to maintain the Point Clear property.

## Point Clear Property

The Point Clear property owned by the Gonzales Trust is located on the eastern shore of Mobile Bay at 14679 Scenic Highway 98. The lot is approximately 100 feet by 295 feet with 100 feet on the bay. There is a pier that extends from the property into the bay and a 900 square foot cottage on the property. Mrs. Earle's stepmother lives in the cottage. The property is south of Bailey's Creek, but north of Mullet Point. Mr. Hall's written appraisal of the Point Clear property was placed into evidence. According to Hall, properties on the eastern shore have gone way up in value in the last few years, and will continue to appreciate at a rate well above the inflation rate. In his opinion, the Point Clear property is worth $400,000 or $4,000 per frontage foot based on comparable sales and his experience. This is the value now and when Mrs. Earle filed bankruptcy. Some properties near the Grand Hotel have sold for as much as $12,000 per frontage foot. In the Mullet Point area, properties now sell for $2,000 to $2,500 per frontage foot. The closer the property is to the Grand Hotel, the more valuable it is. In Mr. Hall's opinion, the house on the property does not add any value to the property. The house could be torn down and the property subdivided into two lots. Mr. Hall's opinion is that Mrs. Earle's one-fifth remainder interest in the Point Clear property is worth substantially more than the value assigned to it on her bankruptcy schedules, although he has never sold a one-fifth remainder interest in property nor heard of a one-fifth interest being sold.

## ISSUES

■ In the adversary proceeding, PCF argues that Mary Earle fraudulently transferred the Stockton property to the Earle Residence Trust and that the con-

veyance amounts to a fraudulent transfer under Alabama Code § 8–9A–4(a). PCF wants the property brought back into the estate for the benefit of creditors. PCF believes that it is a secured creditor because it has a validly recorded certificate of judgment (which PCF says gives it a lien against the Stockton property), and PCF objects to confirmation under § 1325(a)(5) because it has not been offered payment of its alleged secured claim. PCF's objection to confirmation under § 1325(a)(5) is premised upon PCF's position that the Stockton property should come back into the estate. PCF also objects to confirmation and argues that the Earles' plan should not be confirmed because the requirements of 11 U.S.C. § 1325(a)(4) have not been satisfied.[4] PCF contends that if the case were converted to a chapter 7 and Mary Earle's assets were liquidated, PCF (and other unsecured creditors) would received more than zero as proposed in the plan. PCF's objection under § 1325(a)(4) is premised upon PCF's contention that the debtor's interests in the Gonzales Trust and the Earle Residence Trust have been substantially undervalued. PCF thinks that the Earles' case should be converted to a chapter 7 if its objection to confirmation is overruled.

Mary Earle, on the other hand, argues that there was no proof of a fraudulent transfer of the Stockton property and that the Earle Residence Trust was formed as a valid estate planning device and not as a

vehicle to delay or defraud creditors. Consequently, at the close of PCF's case-in-chief, Mary Earle and the other defendants moved for a directed verdict, which the Court took under submission.[5] Mary Earle believes that the $5,000 value placed on her life estate interest in the Earle Residence Trust and $5,000 value placed on her unvested one-fifth remainder interest in the Gonzales Trust is appropriate and that the proposed 0% plan should be confirmed. Debtors object to the admissibility of rental value evidence proffered by PCF to establish the value of Mrs. Earle's life estate in the Stockton property.

■ The issues presented to the Court are:

1. Did PCF make out a prima facie case of fraudulent transfer of the Stockton property under Alabama Code § 8–9A–4(a)? If so, does the preponderance of the evidence go against PCF's claim?

2. Have the requirements of 11 U.S.C. § 1325(a)(4) and (a)(5) been satisfied such that the Earles' zero percent chapter 13 plan may be confirmed?

3. Should evidence of rental value be excluded under *In re Burns*, 73 B.R. 13 (Bankr.W.D.Mo.1986)?

PCF—as the party seeking to set aside the conveyance of the Stockton property—bears the burden of proving the elements of its state law fraudulent transfer claim by a preponderance of the evidence. *In re Tri–Star Technologies Company*, 260 B.R.

---

**4.** PCF's objection filed December 19, 2001 contains numerous other alleged grounds for objection, but PCF only pressed its § 1325(a)(4) and (a)(5) arguments at trial. The Court deems the remaining grounds in PCF's December 19 objection waived.

**5.** The Court treats the defendants' motion as a Rule 52 motion for judgment on partial findings, which is the appropriate motion to be made at the directed verdict stage of a nonju-

ry trial. See *Green v. School Board of Hillsborough County, Fla.*, 25 F.3d 974, 977 n. 1 (11th Cir.1994) (Court noting that Rule 41(b) motion to dismiss should be treated as a Rule 52(c) motion); Fed.R.Civ.P. 41 and 52(a) Advisory Committee Comments. Fed.R.Civ.P. 52 is made applicable to adversary proceedings by Fed.R.Bankr.P. 7052. This Order constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(c).

319, 324 (Bankr.D.Mass.2001); *In re Lawler*, 141 B.R. 425, 428–29 (9th Cir. BAP 1992) (§ 544(b) claim governed by Grogan "preponderance of the evidence" standard); cf. *In re Goldschein*, 241 B.R. 370, 378 (Bankr.D.Md.1999) (Grogan preponderance standard applies to § 548 fraudulent transfer action); and *In re Toy King Distributors*, 256 B.R. 1, 127 (Bankr. M.D.Fla.2000) (applying Grogan preponderance standard to § 548 claim).

■ The debtors—as the proponents of the plan—"must prove by a preponderance of the evidence that it satisfies each of the requirements of § 1325(a)." *In re McMillan*, 251 B.R. 484, 486 (Bankr.E.D.Mich. 2000) (citations omitted); *In re Gant*, 201 B.R. 216, 220 (Bankr.N.D.Ill.1996).

The Court will address the claim raised by PCF's adversary complaint first and then discuss the issues relating to confirmation.

LAW

Adversary Proceeding to Set Aside Alleged Fraudulent Transfer

Federal Rule of Civil Procedure 52(c) Standard

■ Awarding a defendant judgment as a matter of law pursuant to Fed. R.Civ.P. 52(c) "is appropriate where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim," *Stokes v. Perry*, 1997 WL 782131, *8 (S.D.N.Y.1997), citing 9A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 2573.1 (2d ed.1994). Unlike motions for summary judgment or directed verdict, when a court considers a Fed.R.Civ.P. 52(c) motion, the nonmoving party is not entitled to any special inferences nor is the court to consider the evidence in a light most favorable to that party. See *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 374 (Bankr.S.D.N.Y.1998) (citations omitted). "Instead, the court acts as both judge and jury, weighing the evidence, resolving any conflicts, and deciding where the preponderance of evidence lies." Id. at 374. A judgment pursuant to Fed. R.Civ.P. 52(c) "operates as a decision on the merits in favor of the moving party." *Id.*; see also, *Matis v. U.S.*, 236 B.R. 562, 569 (E.D.N.Y.1999) (applying same standard as Regency Holdings (Cayman), Inc.); *Lamarca v. U.S.* 31 F.Supp.2d 110, 123 (E.D.N.Y.1998) (same); *Hoseman v. Weinschneider (In re Weinschneider)*, 2001 WL 197886, *2 (Bankr.N.D.Ill.2001) (same).

*In re Fanelli*, 263 B.R. 50, 59 (Bankr. N.D.N.Y.2001)

Examination of the evidence before the Court at the close of PCF's case-in-chief reveals that PCF's fraudulent transfer claim fails as a matter of law because (1) PCF has failed to make out a prima facie case; and/or (2) the preponderance of the evidence goes against PCF's claims. Consequently, the Court is granting the defendants' motion for judgment as a matter of law.

11 U.S.C. § 544(b)(1)

■ 11 U.S.C. § 544(b)(1) states in pertinent part that "... the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title ..." "Pursuant to 11 U.S.C. § 544(b), a trustee in bankruptcy or the debtor acting as trustee may avoid any transfer of property of the debtor that is voidable under the applicable state law ..." *In re Munford, Inc.*, 98 F.3d 604, 609 (11th Cir.1996), *cert. denied* sub nom, 522

U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 675 (1998). "Applicable state law" includes state law fraudulent transfer statutes. *In re NextWave Personal Communications, Inc.,* 200 F.3d 43, 49 (2d Cir.1999) (citation omitted). PCF obtained court permission to proceed with the fraudulent transfer claim; thus, there is no issue regarding PCF's standing.

Alabama Code § 8–9A–4(a)

■ The only applicable state law fraudulent transfer Code section available to PCF is Alabama Code § 8–9A–4(a), which requires proof of an actual intent to delay or defraud creditors. Before analyzing the foregoing Code section as it applies to this case, the Court will briefly discuss why no other "constructive fraud" provision of Alabama's Fraudulent Transfer Act applies. Any claim brought under § 8–9A–5(b) must be asserted within one year of the transfer. Alabama Code § 8–9A–9(5). The alleged fraudulent transfer occurred in June 1998 (that is when the Stockton property was conveyed to the Earle Residence Trust). PCF's adversary proceeding asserting the fraudulent transfer claim was not filed until March 19, 2002. Thus, 8–9A–5(b) is clearly not available to PCF.

Alabama Code § 8–9A–9(3) states that a claim under § 8–9A–4(c) and 5(a) must be asserted "within four years after the transfer was made when the action is brought by a creditor whose claim arose before the transfer was made." Section 8–9A–9(4) provides that claims under § 8–9A–4(c) must be brought "within one year after the transfer was made when the action is brought by a creditor whose claim arose after the transfer was made." Thus, if PCF is a creditor whose claim arose after the transfer, § 8–9A–4(c) and 5(a) are not available to PCF under the facts in this case because such claims are time barred. See Ala.Code § 8–9A–9(3) and (4). The Court finds and concludes from the evidence presented that PCF is a creditor whose claim arose after the alleged fraudulent transfer; thus, § 8–9A–4(c) and 5(a) are not available to PCF.

Although Mr. Burton testified that the 1999 loan from PCF to the Earles and M & E Salvage was a "refinancing" of a 1995 pre-Earle Trust conveyance loan to the Earles and M & E, PCF did not produce any promissory note or other writing or memorandum which would satisfy Alabama's Statute of Frauds found in Code § 8–9–2(7). Under § 8–9–2(7), there was no legally enforceable loan obligation owed to PCF by the Earles or M & E Salvage in 1995 because the alleged 1995 loan agreement is void under Statute of Frauds Code § 8–9–2(7). It bears noting here that the 1999 promissory note does not mention the alleged 1995 loan and/or that the 1999 loan is a "refinancing" of the alleged 1995 loan. Moreover, Burton admitted that the alleged 1995 loan was owed to him personally, not PCF. Thus, even assuming that there was a legally enforceable loan obligation in 1995, which there was not, it was an obligation owed to Burton personally, not PCF, and Burton is not a party plaintiff. Since there was no proof of a legally enforceable loan obligation to PCF which arose before the 1998 trust conveyance (i.e., the transfer), the only fraudulent transfer Code section available to PCF under the facts in this case is § 8–9A–4(a), the claim under which was asserted by PCF well within the 10–year limitations period for transfers involving real property. Alabama Code § 8–9A–9(1).[6]

---

6. The Court notes that the only claim raised in PCF's complaint is brought pursuant to § 8–9A–4(a). (Complaint, ¶ 7.) At trial, PCF only argued that § 8–9A–4(a) applied. Moreover, PCF's pretrial brief only discusses § 8–9A–4(a). (Brief, pp. 3–6.) That PCF only

■ Alabama Code § 8–9A–4(a) states that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." "Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor." *Cox v. Hughes,* 781 So.2d 197, 201 (Ala.2000) (quoting *Granberry v. Johnson,* 491 So.2d 926, 928–29 (Ala.1986)). Section 8–9A–4(b) of the Alabama Code sets forth various factors that the Court may consider in determining "actual intent" under § 8–9A–4(a). The Court will discuss each of these factors as they apply to the evidence presented in this case.

Whether the Transfer was to an Insider

■ The first factor is whether the transfer was to an "insider." Ala.Code § 8–9A–4(b)(1). This factor is satisfied. The Stockton property was conveyed by the debtor Mary Earle to the Earle Residence Trust. The debtor's children are the trustees. The Court concludes that the Earle Residence Trust is an "insider" for purposes of § 8–9A–4(b)(1). Although a qualified personal residence trust is not specifically listed in the definition of "insider" in § 8–9A–1(8), the list of "insiders" in that Code section is not exclusive. See Ala.Code § 8–9A–1(8) (definition of "insider" "includes . . .") and § 8–9A–1(7) (definition of "includes," which "[i]s not a limiting term"). In addition, although the trust is technically a separate entity from the Debtor Mary Earle, the sole trustees of the Earle trust are the debtors' children, and relatives of an individual debtor are deemed to be " insiders." Ala.Code § 8–9A–1(8). Moreover, Black's Law Dictionary defines an "insider" in the bankruptcy context as "[a]n entity or person who is so closely related to a debtor that any deal between them will not be considered an arm's length transaction and will be subject to close scrutiny." Black's Law Dictionary 798 (7th ed. West 1999); see also 11 U.S.C. § 101(31) (Bankruptcy Code definition of "insider," which is very similar to the definition found in Ala.Code § 8–9A–1(8)). For the foregoing reasons, the Court finds that PCF satisfied factor one. The transfer of the Stockton property was to an "insider."

Whether the Debtor Retained Possession or Control of the Property Transferred

Factor two is whether "[t]he debtor retained possession or control of the property transferred after the transfer." Ala. Code § 8–9A–4(b)(2). Under the trust agreement, Mary Earle has a life estate and the exclusive right to live rent free in the Stockton house as a personal residence until her death or the expiration of 20 years, whichever comes first. At first blush, this would appear to constitute sufficient retention of possession or control such that factor two is satisfied. Analysis of factor two is rendered more complicated, however, by several factors indicating that Mrs. Earle has relinquished some control. Under the trust, if Mrs. Earle survives the 20 years, then the Stockton house goes to her children. Moreover, for tax purposes, the creation of a qualified personal residence trust is treated as a gift of the value of the remainder interest in the property. And, the trust does contain restrictions on the debtor's use of the property (i.e., it must be used as a personal residence) and on the trustees' ability to sell or transfer the residence. Under the trust, the trustees cannot sell or transfer

raised and pressed a § 8–9A–4(a) claim alone supports the Court's application of § 8–9A–4(a) and no other fraudulent transfer Code sections.

the house to Mrs. Earle, Mr. Earle, or any entity controlled by the Earles during the 20–year term. However, because the asset in question is a house and the debtor is able to continue to live there rent free after the transfer, factor two tips slightly in favor of PCF in this case, primarily due to Mrs. Earle's retention of a life estate in the property.

Whether the Transfer was Disclosed or Concealed

Factor number three is whether "[t]he transfer was disclosed or concealed." Ala. Code § 8–9A–4(b)(3). The Earle Trust document was recorded in the Probate Court of Baldwin County in July 1998. PCF presented absolutely no evidence indicating or establishing that Mrs. Earle attempted to hide formation of the trust or any of its provisions. The evidence was undisputed that had Mr. Burton searched the Baldwin County Probate Court records prior to the 1999 loan transaction, he would have discovered that the Stockton property had been conveyed by Mrs. Earle in June 1998 to the trust. Mr. Burton has been in the investment business for approximately 30 years and frequently invests in real estate. The Court watched Mr. Burton testify. Clearly, Mr. Burton is not an unsophisticated businessman. The Court finds that PCF has not satisfied factor three and that this factor cuts in favor of the debtor.

Pre–Transfer Lawsuits/Threats of Lawsuits

Factor four is whether "[b]efore the transfer was made the debtor had been sued or threatened with suit." Ala.Code § 8–9A–4(b)(4). The transfer occurred on June 26, 1998. There was no evidence that Mrs. Earle either had been sued or threatened with suit prior to the transfer. PCF did not satisfy factor four, and this factor also cuts in favor of the debtor.

Transfer of Substantially All Assets

Factor five asks whether "[t]he transfer was of substantially all of the debtor's assets." Ala.Code § 8–9A–4(b)(5). PCF satisfied this factor. The Stockton property was Mrs. Earle's primary asset at the time of the transfer.

Did the Debtor Abscond?

Factor six is whether "[t]he debtor absconded." Ala.Code § 8–9A–4(b)(6). To the extent that this factor applies, there is no evidence that Mrs. Earle "absconded." Factor six weighs in favor of the debtor.

Removal or Concealment of Assets

Factor seven asks whether "[t]he debtor removed or concealed assets." Ala.Code § 8–9A–4(b)(7). Again, to the extent that this factor applies, there was no evidence that Mrs. Earle removed or concealed assets. To the contrary, as discussed above, the trust conveyance was apparent to anyone searching the Baldwin County Probate Court records. Factor seven goes to Mrs. Earle.

Value of Consideration

Factor eight is whether "[t]he value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred." Ala.Code § 8–9A–4(b)(8). Mrs. Earle testified that she did not remember whether her children paid any "consideration" for the trust conveyance. The trust does not allege any monetary consideration—it states that the property was conveyed "in consideration of the premises and of the mutual covenants herein contained ..." This factor cuts in favor of PCF.[7]

---

7. The Court notes that conveyances made only in return for "love and affection" are deemed to be made for good, but not valuable, consideration under Alabama state law for fraudulent transfer purposes. *McPherson*

Insolvency

Factor nine is whether "[t]he debtor was insolvent or became insolvent shortly after the transfer was made." Ala.Code § 8–9A–4(b)(9). PCF did not prove this factor. The transfer occurred in June 1998. The Earles' chapter 13 case was not filed until more than three years later on November 26, 2001. Many things can change in three years. There was no evidence that in June 1998 Mrs. Earle was insolvent or became insolvent shortly after the transfer. Mrs. Earle wins factor nine.

Substantial Debt Incurred Before or After Transfer

Factor ten asks whether "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred." Ala.Code § 8–9A–4(b)(10). The transfer at issue here did not occur shortly before or after Mrs. Earle incurred a substantial debt. The PCF loan debt was not incurred by Mrs. Earle until August 1999, over one year after the transfer. There was no evidence presented by PCF that Mrs. Earle incurred a substantial debt shortly before the transfer. Mrs. Earle said she "didn't have any creditor problems" at the time. Factor number ten goes to Mrs. Earle.[8]

Other Relevant Evidence Re Actual Intent

 Although PCF satisfied some of the above factors, most of the factors to be considered under § 8–9A–4(b) favor a finding that Mrs. Earle did not actually intend to hinder, delay, or defraud credi-

tors.[9] Some of the objective factors which PCF technically satisfied take on far less significance in this case when one considers the other relevant evidence which establishes that the trust was established as a valid estate planning device. Factor two, for example, asks if the debtor retained possession or control of the property transferred. And, factor one is whether the transfer was to an "insider." Since the Court concludes that the trust was formed as a valid estate planning vehicle and that other relevant evidence demonstrates that Mary Earle did not actually intend to defraud her creditors, the fact that the debtor retained "possession" of the house in the form of a life estate by conveying the house in trust with her children named as trustees should not, under facts of this case, weigh too heavily in favor of a finding of an actual intent to delay or defraud. Otherwise, a transfer might be set aside even though it was done as part of a valid estate planning tool. Accordingly, the Court finds and concludes after weighing the objective factors in § 8–9A–4(b) along with the other relevant evidence presented that Mrs. Earle did not transfer the Stockton property to the Earle Residence Trust with the actual intent to hinder, delay, or defraud any of her creditors under § 8–9A–4(a).

The evidence pertinent to the Earle trust formation which supports the Court's foregoing conclusion that Mary Earle did not actually intend to hinder, delay, or

*Oil Company v. Massey,* 643 So.2d 595, 596 (Ala.1994).

8. Factor eleven found in Alabama Code § 8–9A–4(b)(11)—i.e., whether "[t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor"—does not apply.

9. The fact that PCF may have satisfied some of the objective factors in § 8–9A–4(b) does

not mandate a finding of actual intent to defraud. This is in part because "actual fraudulent intent requires a subjective evaluation of the debtor's motive." *In re Jeffrey Bigelow Design Group,* 956 F.2d 479, 484 (4th Cir.1992). Although consideration of the objective factors has a bearing "on whether constructive fraudulent intent exists ... it is not conclusive for actual fraudulent intent." *Id.* (citation omitted).

defraud creditors is as follows. Attorney Sarah Frierson—who is presumably a disinterested witness—testified by deposition.[10] Frierson's testimony was that Mary Earle had been talking to Xavier Hartmann, a local accountant, in connection with her mother-in-law's estate. Hartmann was the accountant for Mary Earle's mother-in-law's estate. Martha Earle's estate tax return was due in January 1998, a few months before the Earle Trust was formed. Frierson testified that in January 1998 there were "a lot of issues" about Martha Earle's estate, including where the money was going to come from to pay for estate taxes. Frierson assumed from her discussions with Mary Earle that Hartmann felt that a qualified personal residence trust or "QPRT" was appropriate for Mary Earle in order to reduce her potential estate tax liability. Frierson also testified that these types of trusts were popular among estate planners at the time. According to Frierson, Mary Earle did not come up with the idea of forming a trust; Xavier Hartmann was the one who "planted this idea" in Mary Earle's mind. This is a significant fact in the Court's opinion.

Thus, the Earle Residence Trust was not created in a vacuum; Mary Earle and Xavier Hartmann had seen Mary Earle's mother-in-law incur estate tax liability that caused problems for the entire family. It is significant to again note that Hartmann came up with the idea of putting the Stockton property in a qualified personal residence trust presumably in an effort to keep Mary Earle from experiencing problems similar to those experienced by her mother-in-law's estate. That Mary Earle's accountant—and not her—came up with the idea of forming a trust is another strong indication that Mary Earle did not

actually intend to defraud creditors in conveying the Stockton property to the trust. See *In re Mart*, 88 B.R. 436, 438–39 (Bankr.S.D.Fla.1988) (no fraudulent intent found where trust and annuity were proposed by an estate planning attorney unrelated to the debtor and trust and annuity were designed solely for estate planning to minimize estate taxes).

Frierson did not have any discussions with Mrs. Earle about her protecting the Stockton property from creditors by forming the Earle Trust. And, Mrs. Earle testified in her post-PCF judgment, prebankruptcy deposition that she did not put the house into the trust to protect it from creditors; she testified point blank that, "I didn't do it for that intention." Although some aspects of Mrs. Earle's testimony from the PCF collection suit and adversary proceeding depositions and trial are not a model of clarity, the Court finds that she did not intend to delay or defraud creditors by forming the trust, particularly viewing her testimony against Sarah Frierson's testimony concerning Mrs. Earle's mother-in-law's estate tax problems and Mr. Hartmann's recommendations to Mary Earle that she create a personal residence trust, the fact that the trust document was recorded in the Baldwin County Probate Court, and the fact that it is undisputed that the idea for the trust came from Xavier Hartmann. The Court watched Mrs. Earle testify and closely evaluated her credibility and the Court finds that she did not intend to hinder, delay, or defraud creditors in forming the trust. She may have been confused at times, but she is not an attorney and obviously relied upon Mr. Hartmann to give her advice concerning estate planning. The Court agrees with the defendants that the trust was formed as a valid estate planning device.[11]

---

10. Frierson prepared the Earle Residence Trust document at no charge to Mary Earle.

11. Some courts have held that once a trustee proves the "confluence of several badges of

Other Case Law Supports the Court's Conclusions

The Court's conclusions are supported by *Case v. Fargnoli,* 182 Misc.2d 996, 702 N.Y.S.2d 764 (N.Y.Sup.Ct.1999). In Fargnoli, a husband created a trust in 1987 naming two of his children as trustees. Fargnoli, 702 N.Y.S.2d at 765–66. The trustees were authorized to make distributions from the trust necessary to support the husband's standard of living at the time the trust was created. *Id.* at 766. The children, including the two trustee children, were to share any remaining interest upon termination of the trust. *Id.* In 1990, the liquid trust assets were worth $276,491. *Id.* The trust assets also included the husband's remainder interest in the marital home. *Id.*

In 1990, three years after creating the trust, the husband applied for Medicaid home care assistance "stating that his wife had insufficient income and resources to pay for her own care." *Id.* In 1993, the husband applied for nursing home care assistance. *Id.* Total agency benefits of $ 131,774 were paid before the husband's wife died in 1996. *Id.*

The Department of Social Services brought suit against the husband claiming that his transfer of assets to the trust in 1987 was a fraudulent transfer as to future creditors. *Id.* at 767–68. The Court in Fargnoli stated that while the circumstantial factors bearing on the actual intent to defraud were "decidedly mixed," the Department of Social Services had failed to

show that the 1987 transfer was intentionally fraudulent. *Id.* at 768. The Court noted that "[w]hile the relationships between settlor and the trustees/remaindermen are close, there was no secrecy or duplicity in the 1987 creation of the trust and no evidence that settlor knew, at the time, that medical costs exceeding his capacity to pay would descend upon him in consequence of a future protracted illness of his spouse." *Id.* The Court framed the issue as follows:

> Concededly, the trust was designed to shelter assets from possible future estate tax liability and claims by medical service providers. Cautionary estate planning may run afoul of Medicaid regulations but the 1987 creation of the trust cannot be considered fraudulent under the Debtor and Creditor Law unless the facts and circumstances which invoke the statute have been established.

*Id.* at 768. The Fargnoli court found no actual intent to defraud creditors even though there was evidence that the husband retained the power to change beneficiaries (excluding himself, his spouse, or creditors of either) and evidence that the application for nursing home care assistance was "neither entirely candid nor wholly truthful." *Id.* at 766.

The evidence surrounding Mrs. Earle's creation of the Earle Residence Trust was much like that in Fargnoli. Like Fargnoli, there was no evidence of secrecy or duplicity in the creation of Earle trust. Indeed,

---

fraud," a presumption of fraudulent intent arises, and the burden then shifts to the transferee "to prove some 'legitimate supervening purpose' for the transfers at issue." *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998) (quoting *In re Acequia, Inc.,* 34 F.3d 800, 806 (9th Cir.1994)). It is unnecessary for the Court to decide whether PCF is entitled to the foregoing presumption, for the Court finds as a matter of law that there was no actual

intent to delay or defraud even if such a presumption initially did arise, which the Court does not determine. Stated differently, even if PCF was entitled to a presumption of fraudulent intent, which the Court does not believe that it is, the defendants are still entitled to judgment as a matter of law on PCF's claim because the Court finds that in this case valid estate planning constitutes a "legitimate supervening purpose" as a matter of law.

the trust document was recorded in Baldwin County Probate Court. Moreover, it is undisputed that Mrs. Earle's accountant is who came up with the idea of putting the Stockton property in trust. Also like Fargnoli, there was no evidence indicating that at the time the trust was created Mrs. Earle knew that she was about to incur debt beyond her ability to pay. The PCF loan debt was not incurred by Mrs. Earle until over a year after the trust was created, and the rest of Mrs. Earle's scheduled unsecured debt was incurred in 2000 and 2001. Fargnoli supports the Court's findings and conclusions that PCF has failed to prove that Mrs. Earle actually intended to delay or defraud her creditors.[12]

▮▮▮▮ The Court's conclusions are further supported by other principles of fraudulent conveyance law. The Alabama Court of Civil Appeals has stated that "every conveyance that frustrates a creditor is not a fraudulent conveyance under the statute." *Aucoin v. Aucoin*, 727 So.2d 824, 827 (Ala.Civ.App.1998). The Old Fifth Circuit has held that "[a]lthough a transfer may have the effect of hindering or delaying or defrauding creditors, incidental effect is not enough to satisfy the requirement of actual intent to defraud." *Mayo v. Pioneer Bank & Trust Company*, 270 F.2d 823, 831 (5th Cir.1959) (case decided under Bankruptcy Act), *cert. denied*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). And, it has been recognized that where there is "significantly clear" evidence of a "legitimate supervening purpose," a court may find no intent to defraud even in the presence of several "badges of fraud." See *Max Sugarman Funeral Home v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991).[13]

▮▮▮▮ The salient point behind Fargnoli, Aucoin, Mayo, and Sugarman is that when the "actual fraud" fraudulent transfer statutes are at issue, proof of an actual intent to delay or defraud without any legitimate supervening purpose is necessary before a court may conclude that a transfer is a fraudulent one. A transfer may frustrate and/or incidentally affect a creditor, but that is not enough to prove fraud, particularly where there is a legitimate reason proven for the transfer. Here, that reason was valid estate planning. PCF failed to meet its burden of proving an actual intent to delay or defraud creditors.

### PCF's Arguments are Wrong

PCF argues that "it is not believable that Mary Earle entered into the QPRT agreement in this case for estate planning purposes." (Pretrial Brief, p. 3). PCF first says that Mary Earle's testimony referencing putting the property in trust to avoid bickering among her children "makes no sense" because, according to PCF, putting the Stockton property in a trust would not keep that from occurring. PCF's argument is wrong because it ignores other aspects of the record which clarify what Mary Earle meant when she referred to placing the Stockton property in trust to avoid fighting among her children. It is apparent from Sarah Frierson's testimony that Mary Earle was intimately involved in her mother-in-law's estate (recall that Mary Earle served as the estate representative) and that Mrs. Earle witnessed firsthand what problems can occur when one has estate tax liability. Frierson testified

---

**12.** The Court acknowledges that Fargnoli was decided under a "clear and convincing" standard of proof, Fargnoli, 702 N.Y.S.2d at 768, but that does not alter the Court's conclusion.

**13.** Max Sugarman has been cited with approval by the Eleventh Circuit. *In re XYZ Options*, 154 F.3d 1262, 1271 n. 17 (11th Cir.1998).

that there were "issues" among Martha Earle's family members as to who was going to pay the estate taxes. It was during this time that Mr. Hartmann recommended a trust for Mary Earle. Undoubtedly, estate tax liability and decisions regarding who is going to pay the taxes could cause "bickering" in a family, and to the extent potential estate tax liability can be reduced or eliminated with a QPRT, the likelihood of there being squabbles among family members over who will pay the taxes decreases. The Court believes that the foregoing—i.e., creation of a trust to reduce estate taxes, which in turn may reduce the possibility of family argument—is what Mary Earle was referring to when she testified that the trust would keep her children from fussing among themselves, although Mary Earle had some trouble clearly articulating this point.[14]

 PCF also argues that "Mrs. Earle's behavior was not consistent with an estate planning purpose." (Pretrial Brief, p. 4). As support, PCF contents that no gift tax return was filed in 1998. *Id.* PCF's argument is wrong for at least two reasons. First, PCF ignores the entirety of Mary Earle's deposition testimony. It was Mary Earle's testimony that to her knowledge no gift tax return was filed. Her testimony was that her accountant handles her taxes and that he "could have" filed a return, but she didn't know if that was done. Second, even assuming that no return was filed in 1998, that does not alter the Court's conclusion that Mrs.

Earle did not actually intend to delay or defraud her creditors. As the Fargnoli case points out, cautionary estate planning may violate governmental regulations (such as the Medicaid rules), but that alone does not render a transfer fraudulent. Fargnoli, 702 N.Y.S.2d at 768. If a gift tax return was not filed, that may subject Mrs. Earle to sanctions under federal law and/or IRS regulations, but failure to file a gift tax return does not per se render the trust transfer fraudulent as to creditors.[15]

Finally, PCF argues that "there is no evidence that Mrs. Earle actually needed the QPRT for any estate planning purposes." (Pretrial Brief, p. 4). PCF believes that because it appears that Mrs. Earle may not exceed the lifetime gift tax exemption due to the relatively small size of her estate, she has no need for a QPRT. *Id.* PCF's argument is wrong because it ignores important record evidence. Frierson testified that she understood that Mary Earle's accountant Xavier Hartmann felt that a QPRT was appropriate for Mrs. Earle. It was Hartmann who, according to Frierson, came up with the idea for the QPRT, which was a popular estate planning tool in 1998. And, Mary Earle relied upon her accountant in setting up the trust. Moreover, the evidence establishes that there was no substantial detriment and potentially great benefits to Mrs. Earle in forming the trust. Mrs. Earle reduced her estate size thereby minimizing the likelihood of estate tax liability in the future. True, it appears that she was not over, and due to the new exemption "step-

---

14. Even if the Court is wrong in its interpretation of Mary Earle's testimony on this point, that would not alter the undisputed fact that Xavier Hartmann came up with the idea of putting the property in a QPRT. Stated differently, that Mary Earle may not be able to clearly articulate a valid estate planning reason for the QPRT does not mean that a valid reason does not exist.

15. Furthermore, according to attorney Sarah Frierson, a gift tax return was not required to be filed in 1998 as PCF argues in brief. Tax returns for gifts made in 1998 are not due until April 15, 1999.

ups" in the IRS Code, may not ever exceed the exemption amount. There is a possibility, however, that one day her estate could exceed the exemption amount. She could inherit money. She could hit the lottery, although the Court understands that lottery winnings are very, very unlikely. And, there is no substantial detriment to Mrs. Earle in forming a QPRT because if she dies before the 20 year trust term expires, the Stockton house will be brought back into her estate and distributed accordingly, and her gift tax exemption is restored (recall too that normally no gift tax is actually paid for the trust gift because one may simply use part of one's lifetime gift tax exemption). Because the evidence establishes that there was no real detriment to forming the QPRT and that there is a potentially valuable benefit to Mrs. Earle in having such a trust, the Court cannot conclude on the record before it that formation of the qualified residence trust was inappropriate for fraudulent transfer purposes even though Mrs. Earle's estate is not very large, particularly since it was Xavier Hartmann's idea to form the trust.

For the above reasons, the Court is granting the defendants' motion for directed verdict, which is treated by the Court as a motion for judgment on partial findings.

PCF's Objection to Confirmation

■ PCF objects to confirmation based on 11 U.S.C. § 1325(a)(4) and (a)(5). Because the Court concludes that the Stockton property was not fraudulently transferred by Mrs. Earle to the Earle Residence Trust, PCF's § 1325(a)(5) argument is rejected because PCF's claim is not secured by the Stockton property. Stated differently, PCF is not a secured creditor (there is no real property for PCF's judgment lien to attach to) and therefore PCF has no standing to complain

that § 1325(a)(5) has not been complied with. *In re Waldman*, 88 B.R. 59, 61 (E.D.Pa.1988) (general unsecured creditor cannot invoke § 1325(a)(5)); see also, e.g., *In re Martin*, 233 B.R. 436, 445 (Bankr. D.Ariz.1999) (court noting that unsecured creditor lacks standing to assert argument that secured claims are not being appropriately paid). The Court, therefore, will address PCF's remaining argument that § 1325(a)(4) has not been satisfied.

■ 11 U.S.C. § 1325(a)(4) states in pertinent part that "the court shall confirm a plan if ... the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." Section 1325(a)(4) "makes confirmation of the plan dependent upon unsecured claims being allocated a value equal to that the claim would have in a chapter 7 liquidation." *Hall v. Finance One of Georgia (In re Hall)*, 752 F.2d 582, 589 (11th Cir.1985), abrogated on other grounds by *Finance One v. Bland (In re Bland)*, 793 F.2d 1172 (11th Cir.1986) (en banc).

■ PCF argues that the Earles' zero percent plan violates § 1325(a)(4) because the amount which unsecured creditors will receive under the Earles' plan—i.e., nothing—is less than the amount unsecured creditors would receive if Mrs. Earle's bankruptcy estate were liquidated in a chapter 7. PCF contends that Mrs. Earle's interests in the Earle Residence Trust and Gonzales Trust are worth considerably more than the value assigned by Mrs. Earle on her schedules and in her trial testimony, even if the Stockton property conveyance is not set aside. The Court agrees with PCF.

Mrs. Earle's Gonzales Trust Interest

It is undisputed that Mrs. Earle has a one-fifth remainder interest as trust beneficiary in the two parcels of property held by the Gonzales Trust. The properties held by the Gonzales Trust will go to Mrs. Earle and her four siblings upon the death of her stepmother, who is now around 60 years old and in good health. The Gonzales Trust holds two properties—the Government Street property and the Point Clear property. A more detailed description of these properties is set forth in the statement of facts.

According to the written appraisal report and testimony of Mr. Frederick Hall of M.D. Bell and Company, the Point Clear property was worth approximately $400,000 at the time the Earles' chapter 13 was filed. There was no evidence that the property had an outstanding mortgage. The Court need not repeat all of the evidence concerning value of this bay front property. The Court accepts and believes Mr. Hall's testimony concerning the value of the Point Clear property and finds that it was worth $400,000 at the time the bankruptcy was filed. It is apparent from Mr. Hall's testimony that bay front properties near the Grand Hotel are quite valuable properties and will continue to appreciate. The Court notes that this property has 100 feet of frontage directly on the Mobile Bay with a beautiful view of the water.

Valuation of the commercial site on Government Street is made more difficult due in part to the fact that the property is under lease to McGuire Oil Company until 2007. According to Mr. Hall, the present value of the McGuire Oil lease using a 10% rate of return as a discount factor is $72,000 based upon the escalating rentals due from McGuire (more particularly set forth in the facts). Mrs. Earle testified that the rentals received on the Govern-

ment Street property are used to maintain the house and property in Point Clear.

The Court acknowledges that Mr. Hall did not use an actuarial analysis (i.e., based on Mrs. Earle's stepmother's life expectancy) in attempting to place a value on Mrs. Earle's one-fifth remainder interest in the above two properties, but the Court generally concludes that Mrs. Earle's one-fifth interest in the Gonzales Trust is substantially more valuable than the value assigned on her schedules ($1.00) and more valuable than $5,000, which is what Mrs. Earle believes her Gonzales Trust interest is worth. The Court bases this finding on the value of the Point Clear property alone. Although Mr. Hall testified that he had never sold one-fifth remainder interests, he believes that there is a market for Mrs. Earle's interest and that the Point Clear parcel could be sold in a suit for division or similar proceeding. In addition, Mr. Burton testified that he would be interested in bidding on and purchasing Mrs. Earle's one–fifth interest in the Gonzales Trust, and that if the case was converted to chapter 7 and Mrs. Earle's interest auctioned, Burton would bid "multiples" of the $5,000 value Mrs. Earle placed on her Gonzales Trust interest.

The bottom line is that if the Point Clear property in a chapter 7 was sold via a partition sale or equivalent proceeding for $400,000, the bankruptcy estate would realize a gross of $80,000 for Mrs. Earle's one–fifth interest. No homestead exemption would be available to Mrs. Earle for her interest in this parcel. Although the $80,000 figure does not account for Mrs. Earle's stepmother's life estate or the expenses of sale, it is clear from the evidence presented that Mrs. Earle's one-fifth interest in the Gonzales Trust—if liquidated in a chapter 7—is far more valuable than $5,000 (which is what Mrs. Earle believes

it is worth). After a trustee paid any expenses associated with a suit for division and sale, unsecured creditors such as PCF would receive at least some distribution on their claims based on the record before the Court, which is more than unsecureds would receive if the Earles' zero percent chapter 13 plan is confirmed.[16] The Court bases its conclusions on the evidence of the value of the Point Clear property alone (which was largely undisputed) without establishing any value of the Government Street parcel or McGuire lease.[17] Consequently, the plan fails to comply with § 1325(a)(4).

Mrs. Earle's Interest in the Earle Residence Trust and the Evidence Objection

PCF presented testimony and a written report from Mr. Hall that Mrs. Earle's life estate interest in the Stockton property held by the Earle Residence Trust as of the bankruptcy filing date was $129,500. Mr. Hall's testimony is based upon his belief that the rental value of the home is $1, 500 per month. The $129,500 figure represents the present value of the stream of hypothetical $1,500 monthly rentals for the approximately 16 years remaining of the trust term (reduced at a 12% discount rate). Mr. Hall's calculations assume that Mrs. Earle will live another 16 years. The debtors objected to the admissibility of the rental value evidence—which was conditionally received by the Court—on the basis of *In re Burns*, 73 B.R. 13 (Bankr. W.D.Mo.1986). The debtors argue that under Burns, evidence of rental value is not admissible and may not be considered by the Court in valuing Mrs. Earle's life estate unless there exists evidence that a viable renter is, in fact, willing to rent the property on the foregoing terms.

■ The Court need not address at this time the debtors' Burns evidentiary objection, and the Court need not make (and is not making) any finding as to the value of or proper method of determining the value of Mrs. Earle's life estate in the Stockton property.[18] As the Court has

16. The priority IRS debt is Mr. Earle's, not Mrs. Earle's; consequently, the priority IRS fine debt of $17,125 would not be paid from sale of Mrs. Earle's trust interest. Mrs. Earle has no priority unsecured creditors.

17. The Court makes no findings concerning the value of the Government Street parcel or the McGuire lease. There was no actuarial evidence presented concerning the value of Mrs. Earle's one-fifth trust interest considering Mrs. Earle's stepmother's life expectancy, although the testimony was that she is 60 years old and in good health. In the absence of any actuarial information and analysis, the Court declines at this point to assign a specific value to Mrs. Earle's one-fifth remainder interest in the Gonzales Trust. The Court notes that valuation of the Government Street property and a specific finding of the value of Mrs. Earle's one-fifth trust interest is unnecessary since the proposed plan is a 0% plan and since it is clear that Mrs. Earle's one-fifth interest is worth more than the value she assigned to it based upon the value of the Point Clear property alone if the Point Clear

property were sold. The Court also notes that the debtors do not argue or contend that a chapter 7 trustee has no authority to force a sale of the Point Clear property in order to liquidate Mrs. Earle's one-fifth interest.

18. The Court notes, however, that the Burns case appears to the Court to be questionable authority for several reasons, including the fact that rental value would appear to be admissible under Fed.R.Evid. 702 and/or 703 with any objection going to the weight that the Court should give such evidence rather than its admissibility. In addition, at least one tax court has considered evidence of fair monthly rental value (reduced to present value) in fixing the value of a life estate, although there was no objection lodged to his evidence. See *David and Barbara Stahl v. Commissioner of Internal Revenue Service*, 53 T.C.M. (CCH) 1273, T.C.M. (P–H) P 87, 323, 1987 WL 40380 (1987). In any event, the Court notes that it is clear that "[a] life estate is a valuable interest in real property." *Snowden v. Secretary of Health, Education and Welfare*, 648 F.2d 1082, 1084 (6th Cir.1981).

already discussed, it is clear from the fact that the Earles have offered to pay unsecured creditors nothing and from the Court's finding that the Point Clear property alone is worth $400,000 that the plan is not confirmable because § 1325(a)(4) has not been satisfied.

CONCLUSION

The Stockton property was not fraudulently transferred by Mrs. Earle to the Earle Residence Trust. Mrs. Earle did not actually intend to hinder, delay, or defraud her creditors. Thus, the Court is granting the defendants' motion for directed verdict and is dismissing with prejudice PCF's fraudulent transfer claim. Because there has been no fraudulent transfer, there is no real property for PCF's judgment lien to attach to and PCF is an unsecured creditor. Therefore, the Court is overruling PCF's objection to confirmation based on 11 U.S.C. § 1325(a)(5), under which only secured creditors may complain.

Based upon the value of the Point Clear property alone, the Court finds that the plan fails to comply with § 1325(a)(4). Consequently, the Court is sustaining PCF's objection to confirmation on this ground. The Court is allowing the debtors to file an amended plan which complies with § 1325(a)(4). Since the Court finds that it is unnecessary at this stage to place a specific value on Mrs. Earle's life estate in the Stockton property, the Court is mooting the debtors' objection to the admissibility of PCF's rental value evidence. The Court is denying without prejudice PCF's motion to convert the Earles' case to one under chapter 7.

THEREFORE, IT IS ORDERED:

1. The defendants' motion for directed verdict—treated by the Court as a motion for judgment on partial findings—is GRANTED. This Order shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(c).

2. PCF's fraudulent transfer claim brought pursuant to 11 U.S.C. § 544(b)(1) and Alabama Code § 8–9A–4(a) is DISMISSED WITH PREJUDICE with each party to bear their own costs.

3. PCF's objection to confirmation based upon § 1325(a)(4) is SUSTAINED. PCF's objection to confirmation based upon § 1325(a)(5) is OVERRULED. The debtors are ordered to file an amended plan within fifteen (15) days of the date of this Order which complies with the provisions of § 1325(a)(4).

4. In the event that PCF objects to the amended plan and it becomes necessary for the Court at a subsequent confirmation hearing to make a determination as to the specific value of Mrs. Earle's one-fifth remainder interest in the Gonzales Trust, PCF shall present appropriate admissible evidence to the Court of Mrs. Earle's stepmother's life expectancy based upon generally accepted actuarial tables, and evidence of the specific value of Mary Earle's one-fifth remainder interest in the Gonzales Trust taking into consideration Mary Earle's stepmother's life expectancy. PCF shall also present appropriate admissible evidence to the Court of Mrs. Earle's life expectancy, and evidence of the value of her life estate in the Stockton property (with an actuarial analysis based on her life expectancy) so that the Court may also determine the specific value of Mrs. Earle's interest in the Earle Residence Trust.

5. In light of the Court's conclusion that it is unnecessary at present for the Court to place a specific value on Mrs. Earle's life estate in the Stockton property, debtors' objection to the admissibility of evidence presented by PCF as to the rental value of the Stockton property is

MOOT. To the extent a further hearing on the amended plan is required, the debtors must reassert any objection to the rental value evidence to the extent that the debtors continue to believe that such evidence should not be considered.

6. To the extent that PCF's counsel's closing argument that the Earle's case should be converted to chapter 7 is considered a motion by PCF to convert the Earles' chapter 13 to a chapter 7, PCF's motion is DENIED WITHOUT PREJUDICE.